AMERICAN SUGAR REFINING CO. v. DELAWARE, L. & W. R. CO.

SAME v. NEW YORK CENTRAL & H. R. R. CO.

(Circuit Court of Appeals, Third Circuit. August 19, 1913.)

Nos. 1,737, 1,738.

**1. COMMERCE (§ 85\*)—INTERSTATE COMMERCE COMMISSION—PROCEDURE.**

The acts of the Interstate Commerce Commission in the exercise of its administrative functions must, in order to be effective, strictly conform to those provisions and requirements of the statutes by which its authority is prescribed and defined, and this is especially true as to those provisions relating to rate-making and rate-changing.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.\*]

**2. CARRIERS (§ 30\*)—INTERSTATE COMMERCE ACT—CONSTRUCTION AND OPERATION—RATES.**

Under the specific and mandatory provisions of section 6 of the Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3156), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (U. S. Comp. St. Supp. 1911, p. 1289), which make it the indispensable duty of an interstate railroad carrier to file and publish schedules of all rates and any rules and regulations which in any wise "change, affect, or determine any part or the aggregate of such aforesaid rates," and prohibit it from charging or receiving any greater or less or different compensation than specified in such schedules, from extending to any shipper any privilege or facilities "except such as are specified in such tariffs," and from making any change in such rates except by plainly changing the schedules or filing or publishing new ones, after 30 days' notice. on the delivery of goods for carriage by a shipper, he has a contract right to the rates named in the schedule at the time on file and published, and to the benefit of all privileges and facilities specified therein which enter into such published rates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.\*]

**3. COMMERCE (§ 85\*)—INTERSTATE COMMERCE COMMISSION—POWER TO CHANGE RATES—PROCEDURE.**

The Interstate Commerce Commission has no power to annul or change a rate, regulation, or practice established by a railroad company by its filed and published schedules, except by a formal order made in conformity to section 15 of the Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 384 (U. S. Comp. St. 1901, p. 3165), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1911, p. 1297).

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.\*]

**4. CARRIERS (§ 32\*)—INTERSTATE COMMERCE ACT—CONSTRUCTION—"REBATE."**

The word "rebate," as used in the Interstate Commerce Act of February 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), and its amendments. refers only to such a discount, deduction, or drawback as creates a discrimination in favor of a particular shipper and against other shippers in like situation and destroys that equality of treatment in rates which it is the great purpose of the law to enforce.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.\*

For other definitions, see Words and Phrases, vol. 7, p. 5986.]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. CARRIERS (§ 32*)—INTERSTATE COMMERCE ACT—"REBATE."

    A deduction of two cents per hundred pounds from the freight charge on sugar shipped in carload lots to certain terminal points allowed by the rate schedule filed and published by an interstate railroad carrier to cover cost of transfer from refinery to station, which is allowed to all shippers alike, regardless of the actual cost of such transfer, is not a rebate within the meaning of the Interstate Commerce Act of February 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), nor is it a discrimination within section 3, or otherwise in violation of the act; the net rate being the same to all shippers.

    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*

    What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

    Buffington, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Actions at law by the American Sugar Refining Company against the Delaware, Lackawanna & Western Railroad Company and the New York Central & Hudson River Railroad Company. Judgments for defendants, and plaintiff brings error. Reversed.

For opinion below, see 200 Fed. 652.

Chauncey G. Parker, of Newark, N. J., William A. Glasgow, Jr., of Philadelphia, Pa., and James M. Beck, of New York City, for plaintiff in error.

John L. Seager, Douglass Swift, and Vredenburgh, Wall & Carey, all of New York City (Albert C. Wall, of New York City, of counsel), for defendants in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. These cases are presented upon writs of error to the United States District Court for the District of New Jersey, to review judgments entered in that court, in February, 1913, in favor of the defendants in error, defendants below. They were tried together in the court below, the evidence in both cases involving the same questions of fact and law. They have been so argued here, and what we shall have to say in regard to the assignments of error in the first of the cases named in the caption, will apply also to the second.

The plaintiff in error is a corporation of the state of New Jersey, and on June 10th, 1911, brought an action in assumpsit against the defendant in error, in the New Jersey Supreme Court, to recover the sum of $5,193.59, alleged to be due, with interest, for certain allowances or deductions from the through rate for sugar shipped in carload lots over defendant's road, from Brooklyn, New York, to trunk line points, according to the terms of the printed and published tariffs of the defendant, existing on file with the Interstate Commerce Commission and in force between the month of March, 1908, and the month of May, 1909, during which period the shipments were made.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

These shipments were all in carload lots and were all to different trunk line points. They were all specified in the bill of particulars annexed to the declaration, and were not in dispute. The plaintiff paid to the defendant, upon each shipment, the full amount of the rate, as fixed in the tariff, but never received the allowance, nor was it credited with the same, as deductions, mentioned and stipulated for in the said tariff schedule.

The defendant, being a corporation of the state of Pennsylvania, removed the case to the United States Circuit Court for the District of New Jersey, and then pleaded the general issue.

The parties, waiving trial by jury, agreed that the cause should be tried by the judge, and the case came on for trial, October 8th, 1912. After the conclusion of the evidence, all of which appears in the transcript of record, the learned judge, having reserved his opinion, later filed the same, together with his findings of fact; and as a conclusion of law he also found that the allowance mentioned in the tariffs was unlawful, and directed judgment in favor of the defendant, which was accordingly, on motion, duly entered.

The court, having refused the motions of the plaintiff for judgment in its favor for the amount claimed, the plaintiff excepted thereto and assigned said refusals as error.

It appears from the findings of fact, none of which are in dispute, that the controversy was between citizens of different states, and that the amount in dispute exceeded the jurisdictional amount; that the defendant was a common carrier of passengers and commodities, and was engaged in interstate commerce; that on or before March 2, 1908, it had duly filed with the Interstate Commerce Commission, at Washington, posted and kept open for public inspection, printed tariffs, which named rates for the transportation of sugar over its line from various New York stations, including Brooklyn, to western termini of trunk lines, or points west thereof; such tariffs were kept in force and effect from the last mentioned date until May 1st, 1909, and included a provision, as follows:

"Effective at the Seaboard March 2d, 1908.

"Allowances—Transfer of Sugar.

"51. Allowances for Transfer on sugar in carloads:

"On shipments of sugar in carloads delivered at New York, Brooklyn, N. Y., Jersey City or Hoboken stations, an allowance of two (2) cents per 100 pounds will be made for transfer, to be deducted from through rate when destined to western termini of trunk lines or points west thereof, the western termini points referred to being as follows: Allegheny, Pa.; Erie, Pa.; Salamanaca, Pa.; Bellaire, Ohio; Parkerstown, W. Va.; Black Rock, N. Y.; Buffalo, N. Y.; Dunkirk, N. Y.; Pittsburgh, Pa.; and Wheeling, W. Va."

This provision of the tariff was not changed by the defendant until after May 1st, 1909, but on September 15th, 1908, was made applicable to shipments of sugar from all points within the lighterage limits of New York harbor.

The plaintiff was engaged in the business of refining and shipping sugar, and between March 5th, 1908, and May 1st, 1909, shipped over defendant's railroad, from Brooklyn, N. Y., to western termini

of trunk lines, or points west thereof, 25,854,300 pounds of sugar, in carload lots, and paid to the defendant, by its requirement, the full rates as stated and set forth in said tariff, without any allowance or deduction therefrom of 2 cents per 100 pounds, which was never thereafter paid or refunded to the plaintiff. The judge also found as a fact:

"That all of the said 25,854,300 pounds of sugar were delivered by plaintiff to defendant for transportation at its said station at the Brooklyn eastern district terminal, in Brooklyn, N. Y., and that all of said sugar was by the plaintiff transferred from the refineries of the plaintiff to the said station, by carting the same in wagons drawn by horses, at an expense to the plaintiff of at least 2 cents per 100 pounds, and the said sugar was received by the defendant at the said freight station for transportation over its line."

The amount due to the plaintiff from the defendant, if the provision in defendant's tariff as to such allowance is lawful, was not disputed, and amounted to $5,170.86. The trial judge, however, decided as matter of law, that these allowances or deductions were unlawful, and it is to review this finding that the present writ is sued out.

It is not to be denied as a general proposition, that where a shipment is made in interstate commerce, the schedule of rates filed and posted by the shipper in conformity with the requirements of the Interstate Commerce Act, constitutes a. contract between the shipper and carrier, binding upon both parties. As a corollary to this proposition, it is equally true that any amount exacted under protest from the shipper by the carrier, in excess of the rate prescribed in such schedule, for a. service covered thereby, is recoverable by the shipper in assumpsit, or other appropriate action. The learned judge of the court below, without controverting either of these propositions, placed his judgment as to the law and facts upon two grounds. First, to quote from his opinion filed:

"The validity of these allowances was made the subject of investigation by the Interstate Commerce Commission, on its own motion, under section 13 of the act to regulate commerce, and on December 12th, 1908, were declared to be rebates and in violation of said acts and the acts amendatory thereof and supplementary thereto, in the matter of allowances for transfer of sugar. (Op. No. 742, 14 Interst. Com. Com'n R. 619.) No formal order annulling such allowance was entered in such cause, the Commission stating, in that behalf:

" 'No order will be made at this time, but the Commission will expect the carriers in question at once to conform their tariffs and practices to the purpose here announced. If this is not done, the Commission will take such steps to enforce compliance with its views in this connection, either by an order in this proceeding (jurisdiction of which is reserved for that purpose), or by such other means as it may deem advisable in the premises.'

"In obedience to such decision, the defendants desisted from making such allowances, though no corrected tariffs in conformity therewith were filed by either defendant until after the expiration of the period covered by the claims in suit. * * * The effect of the Commission's decision was to eliminate such allowances from the filed tariffs. No co-operation by the defendants was required to bring about such result. They were as much bound to refrain from making such rebates from the time of such decision until it should be reversed or its operation suspended, as if the tariffs had never contained such allowances. To do otherwise, would subject the defendants to the penalties of the Commerce Act. Such decision was equally binding upon the shippers."

We are compelled to differ from this view, as to the legal effect of the decision and opinion of the Interstate Commerce Commission, as above referred to.

[1] A careful reading of the Interstate Commerce Act, and its amendments, makes it quite clear that the whole subject matter of rate making and rate changing, by carriers who are subject to the provisions of the said act, was intended by Congress to be controlled, either by its direct enactments, or, by the agency of the Commerce Commission, established by it for that purpose.

In the exercise, to that end, of the plenary power to regulate commerce, conferred by the Constitution, Congress has, in the interest of the public, denounced as unlawful certain practices theretofore in vogue, some of which it has penalized as being contra bonos mores, and others, for the purpose of insuring conformity to the scheme of regulation imposed by the act and obedience to the requirements and orders of its administrative agent. So far, however, as carriers are subjected by the act to the administrative authority of the Commission which it establishes, that authority must be strictly pursued. Not otherwise can its merely administrative orders be enforced. In other words, acts of the Commission, in exercise of its administrative functions, must, in order to be effective, strictly conform to those provisions and requirements of the act by which its authority is prescribed and defined.

Especially is this true as to those provisions of the act relating to the important and vital function of rate making and rate changing, which, aside from statutory regulation and the requirements of the common law, as to the duty of common carriers, can be exercised within the domain of that freedom of contract that is incident, under free institutions, to individual enterprise. This will abundantly appear from a brief review of such provisions.

[2] Section 2 of the act declares that if any common carrier, subject to the provisions of the act, directly or indirectly, by special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any other person or persons a greater or less compensation for services rendered, or to be rendered, in transportation, than it demands, etc., from any other person for a like service, it shall be deemed guilty of unjust discrimination, which is thereby prohibited and declared to be unlawful.

Section 3 denounces any undue or unreasonable preference or advantage made or given by any common carrier to any person, company, firm, corporation or locality.

Section 4 forbids such common carrier to receive any greater compensation for a shorter than for a longer haul over the same line or route.

Section 5 makes unlawful the pooling of freights and division of earnings.

These sections are concerned with specific inhibitions of acts and conduct on the part of the carrier, violations of which are denounced as misdemeanors and made the subject of indictment and prosecution, without reference to the action or non-action of the Commission.

207 F.—47

In section 6, however, the law provides for the control of rate making through the instrumentality of the Commission created by the act. Its provisions cover the subject matter in great detail, and its requirements are specific and mandatory, which we quote, as follows:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise *change, affect, or determine any part or the aggregate of such aforesaid rates,* fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, *except such as are specified in such tariffs,*" etc. (The italics here and elsewhere our own.)

Language is incapable of more clearly expressing the legislative intent and meaning, than does that which we have just quoted from section 6 of the act. The indispensable duty is imposed upon the carrier to "file with the commission   \*   \*   \*   and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points." Again:

"The schedules, printed as aforesaid,   \*   \*   \*   shall plainly state the places between which property and passengers will be carried,   \*   \*   \*   and shall also state separately   \*   \*   \*   all privileges or facilities granted or allowed and any rules or regulations which in any wise *change, affect, or determine any part or the aggregate of such aforesaid rates,* fares, and charges, or the value of the service rendered.   \*   \*   \*   Nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privilege or facilities in the transportation of passengers or property, *except such as are specified in such tariffs.*"

The Commission is expressly authorized to reject any schedule which does not set forth the date at which it goes into effect.

When such schedules are once filed with the Commission, by its consent, and posted for the purpose of notice to all shippers, as required by the act, they may not in any respect be changed, altered, or modified, except in the manner prescribed in the act. Until so changed, every shipper delivers his goods for transportation to the carrier, subject to the terms imposed by such schedules, and until so changed, the carrier is under a contractual obligation to abide thereby. Such is the express mandate of the third paragraph of section 6, declaring:

"No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the Commission and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: Provided, that the Commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting, and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions."

No legislative requirement could be more explicit than this, and the new schedule of rates filed by the defendant company, in which it is stated that an allowance of 2 cents per 100 pounds will be made for transfer, to be deducted from the through rate, etc., was clearly binding upon the defendant company, until changed in the mode pointed out by the paragraph of section 6, above quoted.

There is no suggestion here that the defendant made any change in the schedule filed with the Commission, with or without 30 days' notice to the Commission and the public of the change proposed. No more is there any suggestion that the Commission has exercised its power to allow changes upon less than the notice specified, or modified in any way the requirements of the sixth section, in respect to publishing, posting and filing of tariffs. The same section forbids any carrier to "participate in the transportation of passengers and property," unless the rates required by the section "have been filed and published in accordance with the provisions of the act." It further forbids the carrier charging, collecting, or receiving "a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs, than the rates, fares and charges which are specified in the tariff filed and in effect at the time." The section also requires such schedules of rates to plainly state "any rules or regulations which in any wise change, affect, or determine any part, or the aggregate, of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper, or consignee."

There can be no question that, on its face, the schedule filed by the defendant in this case in all respects conforms to the requirements of this act, and especially to those to which we have above referred.

There is no pretense that any "refund" or "remittance" in any manner or by any device has been made of any portion of the through rates stated in the schedule, *except "such as are therein specified,"* as specially provided for in the act, and there is no suggestion that the schedule filed omits "any rules or regulations which in any wise change, affect, or determine any part or the aggregate of the rates, fares, and charges" provided for therein.

We shall comment presently upon the obvious fact, that the allowance or deduction of 2 cents per 100 pounds from the through rate, is in no wise a rebate, nor does it in any way affect the equality of charges to all shippers, nor constitute any discrimination in favor of one shipper over another.

[3] Such being the relation of the parties with reference to the schedules filed by the defendant, in what respect and to what extent is this situation affected by the action of the Interstate Commerce Commission, referred to in the opinion of the learned judge of the court below? The propriety of these allowances of 2 cents per 100 pounds, for transfer, was made the subject of investigation by the Interstate Commerce Commission, on its own motion, under section 13 of the Interstate Commerce Act. On December 12th, 1908, the Commission made a report, in which, as stated by the learned judge of the court below, these allowances were declared to be "rebates," and as such in violation of the Interstate Commerce Act. No formal order annulling such allowance was entered in the case, the Commission stating in that behalf:

"No order will be made at this time, but the Commission will expect the carriers in question at once to conform their tariffs and practices to the principles here announced. If this is not done, the Commission will take such steps to enforce compliance with its views in this connection, either by an order in this proceeding (jurisdiction of which is reserved for that purpose), or by such other means as it may deem advisable in the premises."

The authority to make such an investigation on its own motion is conferred upon the Commission by the statute. Acting strictly within the confines of the authority thus conferred, we do not question the right of the Commission, after due inquiry and opportunity for hearing accorded to the parties concerned, to make an order in accordance with its decision or finding, binding on the defendant, and that in pursuance of such order, it might obtain enforcement of the same in the manner provided by law.

Section 15 of the act prescribes with particularity the manner in which the Commission shall proceed after a full hearing upon a complaint made, or under an order for investigation and hearing on its own initiative. It provides that when the Commission shall be of opinion that any individual or joint rates demanded by a common carrier, subject to the provisions of the act, or any classifications, regulations, or practices whatsoever of such carrier or carriers are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of any of the provisions of the act, the Commission is authorized to determine and prescribe what will be the just and reasonable rates or charges to be thereafter observed,

and what classification, regulation or practice is just, fair and reasonable to be thereafter followed—

"and to make an order that the carrier or carriers shall cease and desist from such violation, to the extent to which the Commission finds the same to exist, and shall not thereafter publish, demand or collect any rate or charge * * * in excess of the maximum rate or charge so prescribed, and shall adopt the classification and shall conform to and observe the regulation and practice so prescribed. All orders of the Commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the Commission."

It appears from a careful reading of the report referred to, that the Commission has done none of these things, as required by section 15 of the act. It has made no order upon the defendant to desist from the practice condemned. It has prescribed no individual or joint rate or charge to be thereafter observed, or what practice, in its opinion, is just, fair and reasonable to be thereafter followed by the defendant. It is obvious that the orders here mentioned and described are essential to give effect to the opinion or finding of the Commission, and that without them, no such opinion or finding can be enforced against the parties concerned.

That this is so, is made more apparent by the requirement of this section, that all orders of the Commission, except orders for the payment of money, shall take effect within such reasonable time, not less than 30 days, etc., and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order. These time limitations are exacting and essential, but the Commission has made no order, judgment, or deliverance to which they are applicable, and for five months after the report of the Commission these schedules remained on file and in force and binding on the defendant. While they continued in force, the plaintiff had a right to demand from the defendant the rate of transportation which they disclosed.

We are not here concerned with the duty of the defendant, in regard to the investigation and report of the Commerce Commission. The schedule filed March 2d, 1907, was not changed thereby during the period in which the overcharge was exacted. If it was binding before December 12th, 1908, the schedule was equally binding after that date, and until it was changed, in accordance with the requirements of the law. The mere opinion of the Commission, as to the character of the deduction or allowance mentioned in the schedule, could not, ipso facto, affect the validity of the same, in face of the positive requirements and prohibitions of the statute in regard to changes in rates which have been filed and published by a common carrier. The policy of the law is that of permanence and stability, that the public may be assured of the rates to which they may be subjected for a transportation service, and that those rates cannot be changed, indirectly or without the formalities and notice expressly enjoined by the provisions of law to which we have referred. If it were otherwise, the result would be demoralization and confusion in the administration of this important public service. The language of Mr. Justice Harlan,

in Louisville & Nashville R. R. Co. v. Mottley, 219 U. S. 467, 477, 31 Sup. Ct. 265, 268 (55 L. Ed. 297, 34 L. R. A. [N. S.] 671), speaking for the Supreme Court, though in another connection, is applicable here. He says:

"It is now an established rule, that a carrier cannot depart to any extent from its published schedule of rates for interstate transportation on file without incurring the penalties of the statute. * * * That rule was established in execution of a public policy which, it seems, Congress deliberately adopted as applicable to the interstate transportation of persons or property."

The power given to the Commission in this respect is confessedly a large and ample one, and for that reason, it is the more necessary that its exercise should be confined within the limits expressly prescribed by the statute. There is no provision in the act to regulate commerce, which permits a tariff provision to be set aside or be discarded or cancelled by the carrier, except by the filing of a new tariff, which was not done in this case until May, 1909, and there is no provision in the act by which the Commission can bring about a condition under which the carrier will be authorized to disregard a tariff provision, except ·by an order entered in pursuance of an investigation made under the provisions of section 15 of the act to regulate commerce, requiring the carrier to "cease and desist from such violation" of the act, as the Commission may find exists, and making such order effective "within such reasonable time, not less than thirty days * * * as shall be prescribed in the order of the Commission." We cannot, therefore, agree that the effect of the Commission's report or decision, as we have it in the record, was, ipso facto, to eliminate such allowances from the file tariffs.

We turn, then, to the second ground upon which the court below based its judgment, to wit, assuming that the decision of the Commission is not binding upon the plaintiff, and that it has a right to institute a suit in this court, in the first instance, for a violation of its contractual rights arising from the filing of these tariffs, nevertheless, it cannot recover, because the allowance or deduction for transfer, specified in the schedule, is but a "rebate," and violative of the act to regulate commerce.

We do not question that such practices on the part of common carriers, as "rebates," "unjust discriminations," "undue or unreasonable preferences," as defined and forbidden in the second and third sections of the act, are immoral and violative of a sound public policy, and that the penalties denounced in regard to them may be ,enforced, as direct violations of law, without reference to the administrative functions of the Commerce Commission. Nor do we doubt that the public policy thus especially declared by the statute, would restrain the enforcement of a contract founded upon such practices. Each of the acts condemned constitutes a criminal offense, and is either defined by the statute or by the inherent meaning of the act as designated.

[4] We think what is connoted by the word "rebate," as used in the act, is clearly set forth in the second section, which classes it with other acts by which unjust discrimination may be practiced. Such unjust

discrimination consists, to quote the act, in demanding, collecting, or receiving—

"from any person or persons, a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them, a like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions." .

A rebate is nowhere in the act declared illegal, except where it produces this result.

It is true, the word "rebate" has an etymological or dictionary meaning, which includes any discount or deduction from a stipulated payment, charge, or rate not taken out in advance of payment, but handed back to the payer after he has paid the stipulated sum, even when such discount or deduction is equally applied to all from whom such payment is demandable. It is perfectly apparent, however, that in the Commerce Act the word is used in an offensive sense, and refers only to such discount, deduction or drawback as is the basis of a discrimination in favor of a particular person and against other persons in a like situation, and destroys that equality of treatment in rates, to which the public are entitled and which it is the great purpose of the law to enforce. An undiscriminating rebate is not a criminal offense, nor in any way interdicted or denounced by the law.

[5] It is established by the evidence, and not denied, that this allowance or deduction of 2 cents per 100 pounds for transfer, from the through rate on shipments of sugar, in carload lots, delivered at the stations named, was applicable to all shippers, without discrimination and regardless of whether such shippers paid more or less than 2 cents per 100 pounds for transfer from the refinery to the station, or whether they paid anything at all for such a service. It is sufficiently obvious, therefore, that to all shippers from the stations named and over the designated routes, an equal net freight charge was made. The language in which this deduction is stipulated for in the published schedule, on its face is applicable to all shippers alike demanding or receiving the same or a like service. As we have said, there is no evidence whatever that any discrimination among shippers was made, as to this net rate, demandable for sugar shipped in carload lots from the stations named in the schedule.

We are not concerned here with the scrutiny applied by the Commission to the motives actuating the carrier, in using the words "for transfer," in connection with this allowance or deduction. It may have been, for all we know, the purpose of the carrier to give some plausible excuse for making the net rate under the guise of an allowance for transfer. But we are dealing here with the substance of things, and not with their appearances, and the fact remains, however we look at it, that there was no discrimination among shippers as to any service, for which the carrier had the right to demand compensation. The allowance was made to all shippers alike, whether they actually expended 2 cents per 100 pounds in transfer from the refineries to the station, as it appears the plaintiff did, or more or

less than that sum, or nothing at all. The result was precisely what it would have been if the schedule had named the net rate after the allowance was deducted, as the through rate. It would have been equal to all shippers alike, who delivered their sugar at the place designated by the carrier for its reception, no matter how unequal the cost may have been, of carting such sugar to such receiving station. The defendant was not obliged, in the performance of its public duty, to equalize the accessorial expenses of its shippers.

It was its duty to receive all the sugar of its customers for transportation at designated places on its line, and to charge each shipper the same rate as every other, for a transportation service that was to begin when the sugar had been delivered into its custody for that purpose. The fact that the cost of bringing the sugar to the places designated for its reception by the carrier, was greater to some refiners than it was to others, did not and could not constitute an inequality in the rate of transportation by the carrier. A concession of 2 cents per 100 pounds from the through rate, to all shippers alike, had no tendency to equalize this varying cost to the refiners, in carting their sugar to the receiving station of the defendant company. It left the advantages and disadvantages of the varying distances between the refineries and the station precisely the same as they were before. Nevertheless, this varying cost "for transfer" was not necessarily an unnatural or improper motive for the concession on the part of the defendant company, it if chose to so state it, the important fact being that it was a flat rate deduction to all shippers alike and without discrimination.

Speaking, therefore, of the allowance in the schedule as one "for transfer," does not in any wise alter the real character of the situation. Those who were nearest the station and had short hauls, or none at all, in order to deliver their goods, had a natural advantage over those further away, but this would have been the case, whether a deduction was made or not, as long as that deduction was undiscriminating.

The allowance here in question is not a rebate, because it was not a concession from the published schedules, but an allowance in accordance with them. Peavey & Co. v. Union Pac. Ry. Co. (C. C.) 176 Fed. 409. Moreover, it was not discriminatory or preferential in its character, and had none of the characteristics of a rebate offensive to either the common law or the statute.

We are of opinion, therefore, that the second ground upon which the learned judge of the court below places his judgment, is inadmissible, and that there was no such offensive rebate, within the meaning of the statute, practiced by the defendant, as would render void the shipping contract between the plaintiff and defendant.

The judgments below should be reversed and entered in favor of the plaintiff for the full amount of the claim, as ascertained by the findings of fact, which are not now in dispute.

And it is so ordered.

BUFFINGTON, Circuit Judge, dissents.