### PENNSYLVANIA R. CO. v. M. McGIRR'S SONS CO. *

### DIRECTOR GENERAL OF RAILROADS v. SAME.

(Circuit Court of Appeals, Second Circuit. December 11, 1922.)

Nos. 16, 17.

1. **Commerce** ⬅➡21—**Towage of shipper's car floats held not part of interstate carriage.**

Where a shipper loaded his goods into cars in New York and placed the cars on his own car floats, which were then towed to a railroad terminal in Jersey City, where the destination was declared and bills of lading issued, and the shipper could have employed any tugboats he chose to tow his floats, but did in fact employ the boats belonging to the railroad company over whose road the cars were subsequently transported, the towage was not a part of the interstate carriage, but was accessorial service.

2. **Carriers** ⬅➡30—**Carrier can recover for towage not part of interstate carriage without filing tariffs therefor.**

A railroad company engaged in interstate commerce can recover for its services in towing a shipper's car floats, which service was not

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

*Certiorari denied 43 Sup. Ct. 520, 67 L. Ed. —.

a part of the interstate carriage, though it has not filed with the Interstate Commerce Commission a tariff showing the charges for such services as required for charges for interstate carriage by Interstate Commerce Act, § 6, as amended by Act June 29, 1906, § 2 (Comp. St. § 8569).

**3. Carriers &#9758;30—Collection of unpublished rate is not prohibited.**

Interstate Commerce Act, § 6. as amended by Act June 29, 1906, § 2 (Comp. St. § 8569), providing that the carrier shall not collect a greater or less or different compensation than the rates, freights, and charges which are specified in the tariff filed, does not forbid the collection of a rate not published in the filed tariffs for a service not mentioned therein.

**4. Towage &#9758;7—Shipper held liable for rate charged notwithstanding protest.**

Where a railroad company operating towboats notified a shipper of an increased charge for towage, and was not induced to change its charge by the shipper's protest, the shipper was liable for the increased rate, if after such announcement he ordered the towage and the services were rendered.

**5. Accord and satisfaction &#9758;7(1)—Remittance of part of charge after reducing amount stated in bill held not payment in full.**

Where bills were rendered for towage services at an increased rate, which it had been stated would be charged for such services, remittances made by the debtor at the old rate, after striking out the new rate from the bills and inserting the old rate, were not a payment in full, but a payment on account.

Appeals from the District Court of the United States for the Southern District of New York.

Separate libels by the Pennsylvania Railroad Company and by the Director General of Railroads operating the Pennsylvania Railroad against the M. McGirr's Sons Company, to recover for towage of respondent's car floats. Decree for libelants in each case and respondent appeals. Affirmed.

J. Edward Murphy, of New York City (John Vance Hewitt, of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and William J. Dean, both of New York City, of counsel), for appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The appellant maintains manure dumps at the foot of Thirtieth street North River, Stanton street, East River, and Sixth street, Brooklyn. It loads its cars on its own car floats at these piers. The cars in question were towed by the appellee's tugs on the appellant's car floats to be transported over the Pennsylvania Railroad to Pennsylvania, Maryland, and other states. The appellant owned two car floats, each having a capacity of six cars. The method of carrying on the work was to load six empty cars on the appellant's boat and tow them to one of their dumps, where the cars were loaded. The appellee's tug would then tow the float back to the New Jersey Terminal. There the appellant would prepare in triplicate bills of lading showing from where the cars were loaded and their place of destination, and mail these to the appellee's freight office, or send them

&#9758;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

direct by the float captain to the terminal from which the cars came. The appellee stamped the bills of lading with the weight, the name of the New Jersey Terminal, the date of receipt, and returned a copy to the appellant. For each carload a separate bill of lading was issued and a freight bill rendered, showing the freight charges as per tariff from the New Jersey Terminal to the destination named. The towage charges were billed separately by the appellee. Bills of lading were issued at the New Jersey Terminal, where the loaded cars were received and the freight paid from that point to destination at the commodity rate, instead of from New York City to the destination at the more expensive class rate. There is a class rate, but no commodity rate on shipments of manure from New York City. It appears that the appellant's dumps are within the free lighterage district, but free lighterage applies only to goods upon which a freight rate is charged to and from Greater New York, and rule S–1 of the Traffic under which the appellant's shipments were made, expressly provides that manure is not shipped lighterage free.

These suits were brought to recover a balance of $18 per car float for towage of appellant's car floats by the Pennsylvania Railroad Company from September 19 to December 28, 1917, and by the Director General of Railroads from January 2 to March 6, 1918. It is admitted that towage was paid at the rate of $12 per car float, and it is urged that the charge of $30 per float is arbitrary and discriminatory, and that $12 per float was received in full for such services. In June, 1917, the appellees advised the appellant that commencing June 15th the rate would be $20 each way per float and $8 per hour while waiting for loaded cars to be taken off, and the float reloaded with empty cars. Objection was made to this new rate, the date of putting it into effect was postponed, but commencing September 19, 1917, the appellees rendered towage bills at the rate of $30. The appellant paid at the rate of $12, which was the prevailing rate since 1912. When the appellant received the bills, it crossed out the figures "30" and wrote in "12" and paid this amount. It is to recover this difference, to wit, $18 per float, that these suits were instituted.

[1] The District Court found that the price was fixed and services were accepted on the basis of $30 per float, and held that the payment of $12 in the manner described was merely payment on account. It was contended below, as here, by the appellee that the towage in question was an accessorial service, and not part of the appellees' interstate carriage. We think it definitely appears that the appellees' relation as carriers did not commence until the cars were run off the floats onto their tracks at the New Jersey Terminal. While on the float, they were in the possession of the appellant and in the custody of the captain of the appellant's float. The bills of lading were stamped with the name of the New Jersey Terminal, and the freight was paid from that point to the place of destination. The appellant was free to engage any towage service it pleased, but for reasons sufficient to itself it employed the appellees' tugs instead of other towing companies. Under these circumstances, we think the floats were the appellant's own ve-

hicles of transportation used as preliminary to delivery by it to the appellees for further interstate transportation.

In Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, logs were hauled and floated from the point where cut until delivered at the railroad station for interstate transportation, and it was held that:

"The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain."

Under the Hepburn Act of June 29, 1906 (30 Stat. 584 [Comp. St. § 8563]), transportation as used in the Interstate Commerce Act includes "all services in connection with the receipt, delivery, icing, storage and handling of property transported." But the act provides that every carrier subject to its provisions must provide and furnish such transportation upon reasonable request therefor. But this implies such transportation service as a carrier is bound to furnish. There was no obligation to furnish free lighterage and the appellees were under no duty to tow its car floats.

In United States v. B. & O. R. R. Co., 231 U. S. 274, 34 Sup. Ct. 75, 58 L. Ed. 218, it was held that the railroad company was under no duty to furnish free lighterage to the sugar companies whose docks were outside the free lighterage district of New York. Such a demand was said to be for accessorial service as much as if a demand was made for carting their shipments to a depot or station.

In Crane Iron Works v. United States (Conn. Ct.) 209 Fed. 238, where loaded cars destined for the plant of the plaintiff were placed by the Central Railroad upon the track known as the "exchange track," from which they were hauled by the iron company's locomotives to the plant, cars loaded for movement out were taken by the same locomotives and placed upon the "exchange track" where the Central Railroad received them and transported them to destination. In the course of time, the Iron Company extended its rails to other industries near by and moved cars for them to and from the "exchange track." The road was operated by the corporation organized for that purpose, and called the Crane Railroad, the capital stock of which, as well as that of the Iron Company, was owned by a parent corporation. It was held by the Interstate Commerce Commission that the Crane Railroad was a mere plant facility, performing services which the Iron Company should perform for itself. Draying sugar from a refinery to the railroad, where it is transported in interstate commerce, does not constitute transportation or service connected with transportation, within section 15 of the Interstate Commerce Act (Comp. St. § 8583), but is an accessorial expense of the shipper. Amer. Sugar Refining Co. v. D., L. & W. Ry. Co. (D. C.) 200 Fed. 652. The case was reversed for other reasons (207 Fed. 733, 125 C. C. A. 251) where the Circuit Court of Appeals said:

287 F.—22

"The allowance was made to all shippers alike, whether they actually expended 2 cents per 100 pounds in transfer from the refineries to the station, as it appears the plaintiff did, or more or less than that sum, or nothing at all. The result was precisely what it would have been if the schedule had named the net rate after the allowance was deducted, as the through rate. It would have been equal to all shippers alike, who delivered their sugar at the place designated by the carrier for its reception, no matter how unequal the cost may have been, of carting such sugar to such receiving station. The defendant was not obliged, in the performance of its public duty, to equalize the accessorial expenses of its shippers."

The situation is different than in Ill. Central R. R. v. Louisiana R. R. Comm., 236 U. S. 157, 35 Sup. Ct. 275, 59 L. Ed. 517, where the railroad company was required to switch empty cars from competing interstate lines to side tracks within its own terminals for the purpose of being loaded with goods intended for interstate commerce and to return the cars, when loaded, to the competing lines for continued transportation to another state, and also required the railroad to accept such competing lines' cars required for other states and to place them on its own side track, which was the real destination contemplated at the time of the original shipment. The court held that such switching movements constituted a part of interstate commerce, the regulation of which Congress had undertaken and the order of the state commission transcended the limits of its powers, or such cases where the bills of lading were issued at a point from which the goods started for their destination outside the state. McFadden v. Alabama Southern Ry. Co., 241 Fed. 562, 154 C. C. A. 338; Texas & New Orleans R. R. Co. v. Sabine Tram. Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442; Ohio R. R. Com. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004.

[2] The exchange of letters which were offered in evidence and the testimony justified the court below in the finding that the towage service was accepted on the basis of $30 per car float. The appellant contends that whether the charge was reasonable or unreasonable, the appellees cannot recover because it had not filed or published a tariff stating the rate for such towage, and for this position reliance is placed on the language of section 6 of the Interstate Commerce Act as amended by the Act of June 29, 1906 (34 Stat. 586 [Comp. St. § 8569]). This section of the statute applies to a common carrier, and the towage is not mentioned among the charges which must be stated in the printed schedules, unless it be that they are referred to as "other charges which the Commission may require" to be stated. But the Commission had never issued any order in respect to towage services involved in this litigation. The appellees have collected such charges in the practice between the parties for years and the appellant never questioned the legality until this rate increase occurred.

[3, 4] Section 6 does not forbid the collection of an unpublished rate. It provides that the common carrier shall not collect a greater or less or different compensation for such transportation of passengers or property or of any service in connection therewith than the rates, freights, and charges which are specified in the tariff filed.

This relates to a common carrier and service in connection therewith. But it has no application to services rendered in advance of the carriage. In the absence of a published tariff rate, the carrier can recover for services such as this towage was. While the appellant protested against the increased charge for towage, this protest did not cause the appellees to alter their determination to charge $30 per car float, and it was after such announcement that the towage was ordered and the services rendered. Ten Eyck v. Director General of Railroads (C. C. A.) 267 Fed. 974.

[5] The fact that when the bills were received by the appellant it struck out the charge of $30 and marked it $12 and paid only $12 when it returned the bill, would not be an acceptance by appellees of the $12 as payment in full and would be but a payment on account. Since the towage contract is held by us not to be part of the interstate carriage contract, but a private one, the question of unjust discrimination under the act is not presented.

Decree affirmed.