## THE CUTCHOGUE.

(District Court, S. D. New York. March 16, 1925.)

**1. Towage ⊂⇒14—One who availed himself of services after refusing conditions thereof assented to terms on which services were rendered.**

Where railroad company had notified libelant that it would not be responsible for vessels towed by its tug, libelant, although rejecting such condition by consenting to shifting of float by railroad's tug, receded from its refusal, and conditions laid down by railroad company applied.

**2. Towage ⊂⇒14—One who has knowledge of custom of railroad company to shift floats from bridge, by failing to have tug ready to do shifting, authorized railroad company to do so.**

Where owner of car float with knowledge of custom of railroad company to shift floats from its bridge, failed to have tug at bridge to do shifting, railroad company was authorized to do it, and liability, from which railroad company had by notice expressly exonerated itself, could not be imposed because service was gratuitous.

In Admiralty. Libel by the Lehigh Valley Railroad Company against the steam tug

10 F.(2d)—33

Cutchogue, claimed by the Long Island Railroad Company. Libel dismissed.

Decree affirmed 10 F.(2d) 671.

Bigham, Englar & Jones and Andrew J. McElhinney, all of New York City, for libelant.

Burlingham, Veeder, Masten & Fearey, Chauncey I. Clark, and William J. Dean, all of New York City, for claimant.

BONDY, District Judge. This is a libel brought to recover damages sustained in a collision by a float owned by the Lehigh Valley Railroad Company. The float was loaded with cars consigned to the Lehigh Valley Railroad Company, and orders were given by officials of the Long Island Railroad Company to shift the float from the float bridge of the Long Island Railroad Company to a pier to the southward of the float bridge. The Long Island Railroad Company's tug Cutchogue negligently ran but a single line from its bow to a bitt, about one-third of the way from the stern of the starboard or downstream side of the float, and then started to back out into the stream. When the bow of the float cleared the end of the bridge, the float, under the influence of a strong northwest wind and strong ebb tide, swung southerly until it came into contact with a float moored on the north side of the pier.

The claimant contends that it was exonerated from liability for the negligence of its tug while towing libelant's float under the following circumstances: When libelant's tugs brought floats to the claimant's bridge, and the bridge was occupied, they left the floats to be shifted to the bridge by the claimant's tugs. When a float was ready to be taken from the bridge, in the absence of any of libelant's tugs, claimant shifted the float down the river and fastened it to a terminal to await the arrival of one of libelant's tugs. The claimant charged $3 for shifting a float to the bridge, but did not make any charge for shifting the float from the bridge. To escape the expense of keeping a tug at the bridge, awaiting its turn to take the float to the bridge, the libelant usually let the claimant do the shifting of its floats to and from the bridge.

On July 31, 1920, prior to the collision referred to, the claimant wrote to the Lehigh Valley Railroad Company that it had become necessary to cease being responsible for vessels while in tow of or being assisted by its tugs, and that after September 1, 1920, as to all work accepted and performed by tugs owned, employed, or chartered by the Long

Island Railroad Company, all towing will be done at the risk of the tow, and that neither the Long Island Railroad Company, nor the tugs in its service, nor the owners or agents thereof shall be responsible for any damage done to the tow through negligence, and that the masters and crews of the tugs in the performance of the towage service shall become the servants of and identified with the vessel or craft towed, whether singly or with other vessels, and that this applies to the shifting of floats in and around slips, piers, and float bridges.

On August 31, 1920, the libelant wrote to the claimant that the Lehigh Valley Railroad Company refuses to recognize the validity of that notice, or of any future notice of like effect, and that the Lehigh Valley Railroad Company will hold the Long Island Railroad Company responsible for any loss or damage to its equipment, attributable in whole or in part to the negligence of that company's agents or employees, and that in towing and handling the equipment of the Lehigh Valley Railroad Company it is distinctly understood that such service shall thereafter be undertaken with said understanding, previous or any future notices served to the contrary notwithstanding.

On September 7, 1922, the Long Island Railroad Company wrote to the Lehigh Valley Railroad Company that the engaging of its tugs is entirely a matter for the Lehigh Valley Railroad Company's disposition but that if that company elected to engage the Long Island Railroad Company to furnish tugs or use its tugs for towage or shifting purposes, such engagement must be under the conditions contained in the notice dated July 31, 1920.

The libelant contends that the charge made by the Long Island Railroad Company for towing floats to the bridge represented actual service rendered for the Lehigh Valley Railroad Company, because, if the shifting to the bridge were not done by the Long Island Railroad Company, it would be necessary for the Lehigh Valley Railroad Company to keep the tug which brought the float to the terminal at the terminal until the float bridge was open, and the turn of the Lehigh Valley Railroad Company's float to go to the bridge had been reached.

It is further contended that the shifting of the floats from the bridge to some nearby place is done entirely for the benefit of the Long Island Railroad Company, to enable it to carry on its business of moving freight as quickly as possible, and therefore must be done under the highest degree of care notwithstanding the notices.

[1] The letters from the claimant to the libelant constituted a statement of the conditions on which the claimant offered to shift floats, leaving it entirely to the libelant to accept or reject the offer of the claimant. The rejection of the offer in a letter of the libelant did not effect a change of the conditions on which the claimant offered its services. The fact that after its rejection of the conditions the Lehigh Valley Railroad Company consented to the shifting of the float by the Long Island Railroad Company from the bridge to an adjacent pier indicated that it receded from its refusal to accept the conditions and that it was ready to avail itself of the service on the conditions laid down by the Long Island Railroad Company.

In Ten Eyck v. Director General of Railroads (C. C. A.) 267 F. 974, certiorari denied 254 U. S. 646, 41 S. Ct. 14, 65 L. Ed. 455, it was held that towage by the Pennsylvania Railroad Company, after it gave a similar notice, was subject to the condition, therein stated, that the tow assumed all risks of the towing, including the risk of the tug's negligence, and that a tug is not, in relation to its tow, a common carrier, and that a contract between tug and tow, by which the tow assumes all risk of the towing, is not invalid as against public policy.

In Owen McCaffrey's Sons v. Director General of Railroads (D. C.) 282 F. 728, 730, a similar notice and a similar refusal to be bound by the notice were exchanged. Judge Ward stated: "When, subsequently to this correspondence, the libelant, without more, delivered its barge to be towed by the respondent, it must be taken to have abandoned any intention of insisting upon its own terms, and to have assented to towage on the respondent's terms. The minds of the parties met by necessary implication."

In James McWilliams Blue Line v. Davis, 285 F. 312, the Circuit Court of Appeals, Second Circuit, stated: "A carrier cannot, by notice, avoid the responsibility of the consequences of his own negligence, unless the relief is agreed to by the terms of the contract of carriage. Without an actual meeting of the minds constituting a contract, a tug owner cannot avoid the consequences of this negligence in the care of a barge entrusted to him for towing." In that case, however, the contract to tow was made a year and a half after the giving of the notice and the refusal to be bound thereby.

In Pennsylvania R. R. Co. v. M. McGirr's

Sons Co. (C. C. A.) 287 F. 334, certiorari denied 262 U. S. 743, 43 S. Ct. 520, 67 L. Ed. 1210, the Pennsylvania Railroad Company notified the owner of car floats that after a certain date there would be an increased towage charge per float. The owner protested against the new rate, but continued to use the company's tug. The owner of the float was held responsible for the increased rate, the court saying: "While the appellant protested against the increased charge for towage, this protest did not cause the appellees to alter their determination to charge $30 per car float, and it was after such announcement that the towage was ordered and the service rendered."

The claimant's letters in the case under consideration applied to all towage and shifting performed by claimant's tugs, and whether or not a special charge was made therefor.

[2] The fact that the libelant, with knowledge of the custom of the claimant to shift the floats from the bridge, failed to have a tug at the bridge ready to do the shifting, authorized the Long Island Railroad Company to infer that the Lehigh Valley Railroad Company desired its float to be shifted from the bridge by the Long Island Railroad Company. The fact that the Long Island Railroad Company rendered that service gratuitously is not any reason for imposing a liability on the Long Island Railroad Company from which it expressly exonerated itself. If the Lehigh Valley Railroad Company desired not to avail itself of the shifting services rendered by the Long Island Railroad Company, it should have had its own tug in readiness to do its shifting, so as to avoid congestion at the bridge.

The libel, therefore, must be dismissed.