## THE J. L. MINER.

## THE JEREMIAH GODFREY.

### (Circuit Court of Appeals, Sixth Circuit. November 11, 1919.)

### No. 3257.

1. COLLISION ⬅57—NONLIABILITY OF BARGE FOR IMPROPER NAVIGATION OF TUG.

In navigating a tow, the tug is the dominant mind and will, and a barge in the tow is not responsible for improper navigation on the part of the tug.

2. COLLISION ⬅73—PRESUMPTION; DUTY OF NAVIGATING VESSEL TO AVOID ONE AT ANCHOR.

It is the duty of a navigating vessel to avoid one at anchor, and where the vessel at anchor is in a proper place, the presumption of fault in case of collision arises against the navigating vessel; but this presumption does not obtain when the anchored vessel is not in a proper place.

3. COLLISION ⬅73—REBUTTAL OF PRESUMPTION OF FAULT AGAINST ANCHORED VESSEL.

The prima facie fault of an anchored vessel, arising from the fact that it was anchored in an improper place, may be rebutted by competent proof that its anchorage could not have been the sole cause of a collision; but the burden of rebutting the presumption is in such case on the anchored vessel.

4. COLLISION ⬅95(7), 144—LIABILITY OF ANCHORED AND NAVIGATING VESSELS. DIVISION OF DAMAGES.

In a libel by the owners of a houseboat, which was struck by the tow of a tug proceeding down the river, *held* that, though the houseboat was not anchored in a proper place, the collision was not due solely to that fact, and the damages should be divided between the houseboat and the tug.

5. ADMIRALTY ⬅118—REVIEW; WEIGHT OF CONCURRENT FINDINGS OF COMMISSIONER AND JUDGE.

The concurrent findings of a commissioner and judge in an admiralty case will not be disturbed on appeal, unless there is a decided preponderance against the decree or judgment.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Libel by Frank G. Wetherell and another against the tug J. L. Miner, claimed by Alexander Ruelle, and the barge Jeremiah Godfrey, claimed by the Grace Harbor Lumber Company. From a decree for claimants, libelants appeal. Affirmed as to the barge Jeremiah Godfrey, and reversed and remanded as to the tug J. L. Miner.

Hugh M. Edwards, of Detroit, Mich., for appellants.

John C. Spaulding and Sherwin A. Hill, both of Detroit, Mich., for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

McCALL, District Judge. This is an appeal from a decree of the District Court of the United States, in admiralty, dismissing the libel filed by Frank G. Wetherell and Charlotte Wetherell against the tug J. L. Miner and the barge Jeremiah Godfrey.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On the 23d day of October, 1915, the houseboat Halcyon, owned by libelants, was lying in the River Rouge, moored to a dock at the foot of Copeland avenue, Detroit, Mich., when the barge Jeremiah Godfrey, being towed down the river by the tug J. L. Miner, drifted against the houseboat, crushing it, and causing such injuries that she sank.

These specific charges of negligence were made against the tug: First, those in charge of her navigation were careless, incompetent, and inattentive to their duties; second, the tug slowed down waiting for the bridge to open without signaling to the Godfrey in tow; third, the tow line connecting the tug and the barge was too long for use in said river; fourth, the tug passed too close to the houseboat and negligently permitted the barge to drift over and collide therewith.

In the view we have taken of the case it is not necessary to state the specific negligence charged against the barge. The owners of the tug and barge admit the collision, but deny the specific allegations of fault and negligence alleged in the libel, and aver that the collision and damage resulting therefrom to the Halcyon were due to the fault of the houseboat and those in charge of her, and that the damage sustained by the Halcyon was increased by those in charge abandoning her and allowing her to sink and remain at the bottom of the river.

The issues raised by the pleadings were referred by the District Judge to a special commissioner to take testimony and make findings of fact and conclusions of law. No testimony was taken on the question of damages. The commissioner found, and so reported, that the houseboat was negligently moored in a dangerous place and recommended that the libel be dismissed. Exceptions were filed to the report of the commissioner. The District Judge overruled them and a decree was entered dismissing the libel, without written opinion. The effect of this decree was to sustain the commissioner's finding that the Halcyon was solely at fault.

[1] It is sufficient to say that the facts on the record place the barge Jeremiah Godfrey clearly within the rule that in navigating a tow the tug is the dominant mind and will, and, in so far as the proper navigation of the tow is concerned, the tug leads and commands (The Teaser, 246 Fed. 219, 158 C. C. A. 379) and is responsible for her navigation upon condition of the tow's prompt obedience to the directions of the master (The Heffelfinger, 201 Fed. 597). We think it is not shown by the greater weight of the evidence that those in charge of the barge were guilty of negligence in this or any other particular, and therefore the decree appealed from, in so far as it relates to the barge Jeremiah Godfrey, must be affirmed.

[2-4] The material facts, as found by the commissioner and approved by the District Judge, are substantially as follows: The Halcyon was 47 feet long and 14 feet beam; the tug J. L. Miner, 53.7 feet long, 13.8 feet beam, and 6.5 feet depth; the barge Jeremiah Godfrey, 190 feet long over all, 34.9 feet beam, and 14 feet depth. At the place where the houseboat was moored, the river runs in a gradual circle in a general southerly and northerly direction; the houseboat being located on the west bank and at the outer edge of a bend in the river,

which here runs from the southeast to the northwest of the place where the houseboat was, and thence towards the northeast, this bend resembling an elliptical arch. The width of the river at this point is about 125 feet, and the width of the dredged channel about 100 feet. Nine hundred feet below, and in a northeasterly direction from the houseboat, was a drawbridge of the Detroit, Toledo & Ironton Railroad, which spanned the river, with the draw on the southeast side, which could be swung in either direction for the passage of boats. The bridge was usually slow in opening, which was well known to those operating vessels on the river. On account of this slowness it was customary for vessels to be checked down several hundred feet before reaching the bridge, to avoid or lessen the danger of reaching the bridge before its draw had been opened, and vessels proceeding downward toward the bridge frequently check their speed, for the reason stated, at or before reaching the point where the houseboat was located. In this case the tug slowed down some 600 feet above the Halcyon, thus being 1,500 feet above the bridge.

From these facts it is difficult to find ourselves in agreement with the court below, in its decree that the houseboat, closely moored to the dock at the foot of Copeland avenue, was solely at fault. The distance between the houseboat and the east bank of the river was 111 feet and a clear channel of 100 feet through which to pass. When, however, we examine the evidence, and especially the blueprint of a survey of Rouge river at this point, it seems clear that those in charge of the houseboat were not solely at fault. The houseboat lay parallel to the bank, and was moored to the dock outside of the west bank of the channel, and thus left entirely clear the whole of the 100-foot channel for the navigation of the tug and barge. This impression is greatly strengthened when to this is added the fact, clearly established by the evidence, that the captain of the tug had been running out and in the Rouge river for 40 years, and was thoroughly familiar with the river at this point, and knew the houseboat had been moored for more than a year at this particular dock, and further he had navigated the tug, with and without tows, by the houseboat many times, and no collision ever previously occurred.

Why did it occur on the occasion in question? We think the evidence makes it entirely clear. The answer is that the master of the tug was proceeding down the middle of the channel, and failed to steer the tug to starboard until the tug was opposite the houseboat, when he saw the tow was about to collide with the houseboat. It was then too late to clear, because of the slow speed of the tug and the slight wind. The negligence was in navigating the tug too close to the houseboat before he undertook to direct the prow of the barge, which was drifting into it towards the east bank of the river. The barge had gotten so close to the houseboat that her stern did not clear, and crashed into it. Knowing, as he, the master of the tug, did, that the bridge would be slow in opening, and that he must slow down to avoid running into it, and that the barge, because of the bend in the river, the slight wind, and the loss of steerageway, would have a tendency not to follow the tug, prudence and proper care required that, when he

slowed down, he should have earlier steered the tug to starboard, and thus enabled the stern of the barge to clear the houseboat.

While we agree with the finding of the court below that the houseboat was at fault because of its location, we cannot agree that this fault was so gross as to deprive her of the right of protection, at least to the extent of requiring the master of the tug to exercise reasonable care and skill in navigating the tug, commensurate with the danger inherent in the situation which was well known to him. The rule is well settled in this country that a navigating vessel must keep away from one at anchor. The vessel at anchor being in a proper place in case of collision, the presumption of fault lies against the vessel in motion; but this presumption does not obtain when the anchored vessel was where she should not have been. The prima facie fault of the anchored vessel may be overcome by competent proof that its anchorage could not have been the sole cause of the collision. In such circumstance the burden is with the anchored vessel to meet and overturn the presumption by proof of actual fault or want of reasonable care on the part of the moving vessel. The Europe (D. C.) 175 Fed. 596, and cases cited.

We think the court below was warranted in decreeing that the houseboat Halcyon was moored at a dangerous place, and affirmance must follow as to the nonliability of the tug J. L. Miner, unless it clearly appears from a decided weight of the evidence that the tug was also at fault. We have carefully considered the evidence and exhibits thereto, and we cannot escape the conclusion that it does so clearly appear. There is no doubt that it is difficult for a navigator to negotiate the River Rouge at the point in question, with a tug and tow the length over all of the Miner and Jeremiah Godfrey; that is but to say that the degree of care to be exercised by the navigator must be correspondingly greater than it need otherwise be, and especially is this true in this case, when it clearly appears that the master of the tug was thoroughly familiar with the river, the docks and vessels moored along the banks at this point. As has been seen, the Halcyon had been moored at the Copeland avenue dock for more than a year, just as and where she was when the collision occurred, and the master of the tug had many times passed up and down the river in the prosecution of his business as a navigator, and never before had he collided with the Halcyon or any other vessel near her, so far as this record discloses. Indeed, his own evidence tends to show that, had he taken care earlier to have steered the tug toward the eastern bank of the channel, the collision would not have occurred.

If the master's effort to so steer the tug to starboard, after he saw the barge drifting upon the Halcyon, was for the purpose of clearing her, then in the exercise of that degree of care and skill required by the situation he should have so steered the tug earlier, and before the barge was in so close proximity to the Halcyon, and thus avoided the collision. If the situation was so fraught with danger as to have challenged the attention of the master, then it was his duty to have met that situation with a corresponding higher degree of care and skill, to the extent, if reasonably necessary of engaging another tug to hold

the stern of the Jeremiah Godfrey from drifting so far to port, and thus kept her away from the Halcyon.

[5] The rule in this court and generally is that concurrent findings of a commissioner and judge will not be disturbed, unless the evidence decidedly preponderates against the decree or judgment. The Elenore, 217 Fed. 753, 133 C. C. A. 447; Transit Co. v. Moore (6), 259 Fed. 490, —— C. C. A. ——, and case cited. We are of opinion that the evidence in this case decidedly preponderates against the decree below as to the first and last charges of fault alleged against the tug J. L. Miner, and so brings this without the rule just stated.

It follows that the decree below must be affirmed as to the Jeremiah Godfrey, and reversed and decree entered onerating the J. L. Miner with half the damages, when ascertained. The case will be remanded for that purpose, the Halcyon to recover its costs of this court against the J. L. Miner, no costs to be awarded for or against the barge.