### THE CUTCHOGUE.

(Circuit Court of Appeals, Second Circuit. March 1, 1926.)

No. 225.

1. Towage ⚙14—Libelant, failing to answer tug owner's letter exempting itself from liability for damages, after having previously refused to accede to such conditions, is deemed to have consented.

Libelant, failing to answer tug owner's letter that it would not be liable for damages to floating equipment while in tow, after having previously refused to accede to those conditions, must be deemed to have consented to agreement.

2. Towage ⚙3—Libelant, having knowledge of practice of shifting floats when opportunity presented, is deemed to have consented to its float being shifted, without having given formal order on failure to have its own tug present.

Where libelant knew that practice of handling floats at terminal required that they be moved as soon as opportunity presented, it must be deemed to have understood that shifting float was necessary, and, although not having

given any formal order for shifting, failure to have its own tug there would imply that it expected owner of terminal to shift float.

**3. Towage ⇐14—Owner cannot recover for damage to float, after having failed to answer letter of tug owner exempting itself from liability, although owner had first refused to accede to such condition.**

Owner notified by tug owner that it would not be responsible for damages to floating equipment at terminal, who failed to answer letter reiterating condition after owner's refusal to concede such exemption, by accepting use of tug for shifting float, cannot recover for damage.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Lehigh Valley Railroad Company against the steam tug Cutchogue, her engines, etc.; the Long Island Railroad Company, claimant. From a decree for claimant (10 F.[2d] 513), libelant appeals. Affirmed.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson and Andrew J. McElhinney, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and William J. Dean, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The Lehigh Valley Railroad Company's float No. 2003, in tow of the Cutchogue, was damaged while she was being shifted on a single head line from the float bridge of the Long Island Railroad Company to the Yellow Pine dock. The float got out of control and came into collision with a Lackawanna float, which was made fast at the Yellow Pine dock.

The defense interposed was that the No. 2003 was being towed under a contract which provided that such towing was at the risk of the tow, and that the tug employed in the service should not be liable in any event for any damages which she might sustain, including damages sustained through negligence on the part of the tug. This defense was sought to be established by letters exchanged between the parties.

On July 31 the Long Island Railroad Company wrote, stating that after September 1, 1920, it would not be responsible for any damage received by floating equipment, including floats, while lying at its terminal, whether damage arose through the negligence of the company or its employees, or other causes. On the same date, the Long Island Railroad Company wrote a second letter to the Lehigh Valley Railroad Company, stating that after September 1, 1920, "the following conditions will apply to all work accepted and performed by tugs owned, employed, or chartered by the Long Island Railroad Company: All towing is done at the risk of the tow."

On August 31, 1920, the Lehigh Valley Railroad Company wrote, stating that it refused to recognize the validity of the notice set forth in the letter, or any future notices of like effect, and that it would hold the Long Island Railroad Company responsible for any loss or damage to its equipment, attributable in whole or in part to the negligence of the company, its agents or employees, and that "in towing and handling the equipment of the Lehigh Valley Railroad Company by your tugs it is distinctly understood that such service shall hereafter be undertaken with said understanding, previous or any future notices served by you to the contrary notwithstanding."

On September 7, 1920, the Long Island Railroad Company wrote the Lehigh Valley Railroad Company, reiterating its former position, and stated that "the engaging of our tug or tugs through us is entirely a matter of your disposition, but if you elect to engage us to furnish tugs, or use our tugs for towage or for shifting purposes, such an engagement must be under the conditions contained in our notice dated July 31, 1920."

The practice of handling floats at the Long Island Terminal was established to be that, if a foreign tug arrived with a float for which there is an open bridge, the foreign tug placed the float immediately in the bridge. If there was no open bridge, the foreign tug placed the float with others, waiting its turn to be shifted into the bridges. When this float's turn comes, it is shifted into the bridge by a Long Island Railroad tug. A charge of $3 for this shifting was made to the owner of the float. When the float, either loaded or light, was ready to be moved from the bridge, if a tug of the same line was on hand, this tug would take the float away. If not on hand, the float was immediately removed from the bridge by the Long Island Railroad tug, and placed with other west-bound floats waiting to be towed. The reason given for immediately removing floats from the bridges, without waiting for the arrival of the owner's tug, is so as to make

room for another one, and thus avoid a tie-up in the freight traffic.

There was no request to shift the No. 2003, but the Lehigh Valley Railroad Company did not have a tug on hand to shift it, and the contention is that, because of the practice that existed in carrying on the business and under the circumstances, the Long Island Railroad Company was obliged to shift the float. The notice of July 31, 1920, clearly advised the Lehigh Valley Railroad Company that all work accepted and performed by the Long Island Railroad tugs, including the shifting of floats in their slips, piers, and float bridges, would be done at the risk of the tow. If it may be said that the record shows an agreement by the appellant to accept the work with this understanding, then it is not responsible for any damage to the tow through negligence. It is then unimportant as to whose negligence caused the damage to the float.

[1, 2] It is clear that the appellee intended to impose this condition. When objected to, it reiterated its position, and the appellant, having failed to answer the last letter, must be deemed to have consented to this agreement. Under the prevailing practice, it can be found that the appellant expected one of the appellee's tugs to perform this service. While no formal orders for the operation of shifting the float were given, still it must be deemed to have been understood that this work was necessary as a routine in the business and the owner's tacit assent to the conditions may be implied. Undoubtedly the appellant had its choice as to whose tug should do the work. It may have been inconvenient, and perhaps an unnecessary expense, to have its tug at the Long Island Terminal for such use. Appellee was not bound to furnish a tug for bridging or unbridging the float. Penn. R. Co. v. McGirr's Sons Co. (C. C. A.) 287 F. 334. It did so without compensation.

In McWilliams Bros. v. Davis, 285 F. 312, we held that there was no contract between the parties for there was no meeting of the minds. There the tug owner made no reply to the boat owner's declination of the services, while here the appellee replied to the float owner's letter of declination, and the failure to answer would indicate its receding from the position which it took in the one letter it did send. The situation is therefore like that in Ten Eyck v. Director General of Railroads, 267 F. 974, where we held that the terms stated in the notice became part of the towage contract;

10 F.(2d)—43

and where one, by conduct or silence, reasonably appears to give assent to conditions insisted upon by another, he is bound thereby, notwithstanding previous objections.

[3] It appears that unbridging was regularly done by the Lehigh Valley Railroad tug, when one happened to be present, but the record does not disclose that there was one present on this occasion. The fact that the service was free does not affect the situation between the parties. The letters made no distinction between free service and that which is paid for. Where service of the bailee or carrier is free, the courts have recognized and imposed conditions exonerating them from liability for carriage. B. & O. Ry. v. Voigt, 20 S. Ct. 385, 176 U. S. 498, 44 L. Ed. 560. The use of the appellee's tug for shifting the appellant's float invoked the condition stated by the tug owner, and they are binding upon the parties.

Decree affirmed.