use the name of any person from whom it was acquired."

Section 993: "The good will of a business is property, transferable like any other, and the person transferring it may transfer with it the right of using the name under which the business is conducted."

These sections are merely declaratory of the general rules with regard to sale of good will. Section 992 merely provides that, where a person engages in business and sells the good will, the mere sale of the good will does not include the sale of the right to do business under the name of such person, and "person" no doubt includes "corporation." Civ. Code of Cal. § 14. The appellant concedes that, if the order of sale had authorized the purchaser to hold himself out as the successor of the business and good will of Thomas Day Company such a sale and order in all probability would have been valid, but it is claimed that the designation "successor of Thomas Day Company" is unauthorized for the reason that it is not correct and does not state the truth so long as the Thomas Day Company, a corporate entity, is entitled to do business under its corporate name. The appellee does not contend that the Thomas Day Company is dissolved or deprived of the right to do business by the order of the court. It is evident, however, that its right to do business is necessarily modified by the fact that its good will has been sold. In Snyder Mfg. Co. v. Snyder, 54 Ohio St. 86, 43 N. E. 325, 31 L. R. A. 657, it was held that a purchaser of the good will from the receiver of a corporation is entitled to continue the business as successor of the firm and make use of the firm name for that purpose. In Moore v. Rawson, 199 Mass. 493, 85 N. E. 586, 590, it was stated that a convenient way of using the firm name by a purchaser of the good will, if rights of third persons are involved, is by advertising as the successor to the former firm. In Slater v. Slater, 175 N. Y. 143, 67 N. E. 224, 61 L. R. A. 796, 96 Am. St. Rep. 605, it is held that the firm name was an inseparable part of the good will. In Smith v. Brand & Co., 67 N. J. Eq. 529, 58 A. 1029, David H. Brand & Co., a corporation, purchased the good will and assets of Brand and Smith and advertised itself as successors of Brand and Smith. The partners sought to enjoin the use of this phrase, and the injunction was denied. In the case of Van Dyk v. Van Dyk & Reeves, 245 N. Y. 516, 157 N. E. 840, a stockholder of the corporation whose assets, corporate name, and franchise had been sold

in receivership proceedings under an order of the United States District Court to restrain the use of a corporate name by a new corporation, injunction was denied.

Order affirmed.

## BARRETT v. COMPAGNIE GENERALE TRANSATLANTIQUE.
## THE LA SAVOIE.

## COMPAGNIE GENERALE TRANSATLANTIQUE v. BARRETT.
## THE N. JOHN BARRETT.

Circuit Court of Appeals, Second Circuit.
May 12, 1930.

The opinion of the trial court was as follows:

This libel and cross-libel were filed to recover the damages suffered by the tug N. John Barrett and the steamship La Savoie, respectively. They were both injured when La Savoie's propeller came in contact with the tug. La Savoie was a ship of 10,500 tonnage and the Barrett a tug some 84 feet long with 415 horse power engine.

On June 5, 1922, between 9 and 10 a. m., La Savoie arrived from sea at New York Harbor. She proceeded up the North River toward her berth on the north side of Pier 57. The weather was clear, but there was a strong ebb tide and the wind was light. She reached the vicinity of Pier 57 under her own power, and there several tugs, including the Barrett, were employed to assist her into her berth. With the aid of some of the tugs, she was brought to Pier 57, and her starboard bow rested on the upper corner of the pier with her stern extending out into the river at an angle to the pier. Here, the Sandy Hook pilot, who had been in charge of her, was relieved by her captain. On the bridge with the captain were the pilot, her third officer, an interpreter, and three or four sailors; there were also an officer forward and one amidships, and her first officer was aft.

The testimony of the Barrett and La Savoie differs as to just how the tug and the steamer's propeller came in contact, but they agree on one of the important points in the case, which is that the captain of La Savoie ordered the tug, which was standing by, to come up and take a line from La Savoie's port quarter and hold her stern up against the tide. The testimony of La Savoie is that the tug, after assisting to place the steamer against the corner of the pier, was on La Savoie's starboard a little aft of her stern, and that when she got the order to come upon the port quarter and take a line, she crossed too close to the steamer's propeller and the suction drew her against the propeller. On the other hand, the testimony of the Barrett is that she was standing by astern of La Savoie when she got the order from La Savoie; that the steamer's propeller was not in motion and that the Barrett crossed over and stopped her engines and drifted up parallel with the steamer some sixty or seventy feet abreast of her stern; that a heaving line was thrown from the steamer's port quarter to the tug's forward deck which her crew picked up and began walking aft to bring the ship's hawser to the tug, and that while the Barrett was so engaged La Savoie started her port propeller in an astern motion; that the Barrett sounded alarm signals and members of her crew shouted to La Savoie, but the steamer's propeller continued to turn, and although the Barrett's engines were immediately put full speed astern in an effort to avoid it, the suction caused by the propeller drew the Barrett into it and her pilot house struck La Savoie's counter and the propeller cut large gashes in her starboard side forward, so that she sank soon after reaching the shallow water on the Jersey shore. The only testimony as to the actual manner in which the contact between the tug and the steamer's propeller occurred, is that of the captain, the mate, and a deck hand on the Barrett, who testified upon the trial, and a deposition of the captain of La Savoie which was read, so that I did not have the benefit of seeing him. But I was favorably impressed with the character of the witnesses for the Barrett, particularly of her captain, and believe that their testimony was substantially correct and accept it as the facts of the case. I am also inclined to this conclusion as the captain of La Savoie was not in a favorable position to observe how it happened, and the pilot, who was on the bridge with him, said that he himself did not know that it had occurred until six weeks afterwards. Moreover, the captain of La Savoie does not deny that her propeller was still when the Barrett came up to take on the line in response to his order. But he does state that La Savoie's propeller was at intervals moving astern or forward as was usual in the berthing of a large ship, and in this he was corroborated by the pilot. The captain also states that signals were given to the tugs when the propeller was put in motion; one whistle for ahead, and three whistles for astern. The pilot, however, testified that he gave all the signals ordered by the captain and that none of three whistles were given. Those on the Barrett say that they heard no signals at the time from La Savoie. Both sides called expert witnesses as to the effect of the suction caused by a steamer's propeller, but as I am convinced that the tug was drawn into the propeller in about the manner described by the Barrett's witnesses, it is unnecessary to enter into a discussion of a theory as to how it could or could not happen.

From the facts found as stated above, it seems to me that La Savoie must be held entirely at fault. An important feature is the fact that the tug was obeying the express order of La Savoie when she took her position near the steamer's stern on the port side to receive the ship's hawser, and that while she was so engaged in that position La Savoie started her propeller. If the tug had voluntarily selected that manner and place for taking a line aboard and had, in approaching the steamer, passed so close to the propeller which was then or reasonably expected to be put in motion as to be brought in contact with it, that would be another matter. She then would have assumed the risk of her own cap-

tain's judgment and act. But in the case at bar, La Savoie's captain assumed the risk of injuring the Barrett when La Savoie's propeller was started under the circumstances.

In the Ancon (C. C. A.) 263 F. 886, 888, a steamer was proceeding with a tug on her starboard bow. The captain of the steamer ordered the tug to proceed to the steamer's port bow and take a hawser which the tug did. While hauling aboard the hawser, the steamer swung to port and her stem struck the starboard side of the tug. She was held at fault, and the court said:

" * * * It was incumbent upon those in charge of the navigation of the steamship to see that the Juniata [the tug] was not exposed to unnecessary perils. * * * If particular instructions are given, as we find were given by the navigators, of the steamship which put the tug in the position she was in at the time she was struck, any maneuver of the ship without notice, resulting in damage, would be at the risk of the ship, and not of the tug. The Olympic, 224 F. 436, 140 C. C. A. 130; Stevens v. City of New York, 54 F. 181, 4 C. C. A. 268."

In the Olympic, supra, a tug was damaged while assisting the Olympic into her berth by coming in contact with one of the Olympic's propellers. In this case the Circuit Court held the tug and not the Olympic at fault because the tug had voluntarily come up to the steamer's side and called for a line and had not been ordered or invited by the tug to put herself in that particular position. The master of the tug had selected what he thought would be a proper place.

■ On settled principles of negligence where one takes a position at the special instance of another, under such circumstances as applied here, the one directing the other is bound to see that it is not subjected to unreasonable perils.

■ There is testimony that the Barrett could have escaped if her captain had gone ahead toward the bow of La Savoie and that he was wrong in attempting to back away when he saw the steamer's propeller start, but I am unable to determine whether, under all the circumstances, this is so or not. However, the captain of the tug was called upon to act in a sudden emergency, and his judgment was that of an experienced man and was fairly exercised, and he should not be held liable for the consequences if he did err in this respect. See The Mary T. Tracy (D. C.) 298 F. 528, affirmed (C. C. A.) 8 F.(2d) 591.

Accordingly, a decree may be entered holding La Savoie solely at fault and exonerating the Barrett with the usual reference to ascertain the damages.

Joseph P. Nolan, of New York City, for appellant.

Burlingham, Veeder, Feary, Clark & Hupper, Chauncey I. Clark, and P. Fearson Shortridge, all of New York City, for appellee.

Before L. HAND, CHASE, and MACK, Circuit Judges.

PER CURIAM.

Affirmed on opinion below.

---

## Appeal of UNITED STATES.

## In re HEBREW SACRAMENTAL WINE COMPANY, Inc.

## In re 125 FIRST STREET, NEW YORK CITY.

## No. 290.

Circuit Court of Appeals, Second Circuit.

May 5, 1930.

