THE CAR FLOAT NO. 37.

NEW YORK CENT. R. CO. v. LONG ISLAND R. CO.

THE TALISMAN.

No. 274.

Circuit Court of Appeals, Second Circuit.
April 4, 1932.

Burlingham, Veeder, Feary, Clark & Hupper, of New York City (Chauncey I. Clark and Paul Tison, both of New York City, of counsel), for claimant-appellant Long Island R. Co.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Charles A. Van Hagen, Jr., both of New York City, of counsel), for libelant-appellee New York Cent. R. Co.

Purdy & Purdy, of New York City (William F. Purdy and John E. Purdy, both of New York City, of counsel), for Erie R. Co. amici curiæ.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an interlocutory decree in admiralty holding the steam tug Talisman, belonging to claimant Long Island Railroad, liable for damages sustained by the car float No. 37, belonging to New York Central Railroad. No. 37 was moored at claimant's terminal in Long Island City, East River, and was damaged by New York Central car float No. 58 in tow of claimant's tug Talisman. The collision and damage occurred on October 29, 1926, and was caused solely through the negligence of the tug Talisman while engaged in shifting No. 58 to a point at the same terminal where No. 37 was moored.

On July 31, 1920, libelant received a notice from the Long Island Railroad by registered mail stating that:

"On and after September 1, 1920, the following conditions will apply to all floating equipment lying at Long Island Railroad Company terminals, Long Island City, and Bay Ridge, Brooklyn: All vessels, floats or any kind of floating equipment, lying at the Long Island Railroad terminal, Long Island City or Bay Ridge, Brooklyn, are at the risk of the vessel, float, or craft.

"This company will not be responsible for any damage received by said floating equipment while lying at the above mentioned terminals, whether said damage arises through the negligence of this company and/or its employees or through other causes."

There was no proof of any objection on the part of the New York Central to the terms outlined in the foregoing notice, although it does not appear what, if any, use it made of the Long Island Railroad's terminal between September 1, 1920, and the time of the collision.

The trial judge held that the notice did not suffice to relieve the tug Talisman from liability, for the reason that it could not contract against its own negligence.

Both railroads at the time of the accident were common carriers engaged in interstate commerce, and the claimant received car float No. 37 at its terminal at Long Island City in connection with transportation in interstate commerce of freight cars and freight. In such circumstances a notice imposing the conditions under which floating equipment would be received justified the Long Island Railroad Company in receiving the equipment at its terminal upon the conditions specified in the notice in the absence of some statute or rule of public policy prohibiting a contract against its own negligence.

It cannot be said that, because the notice was an old one, given six years before, it had no efficacy. Railroads must certainly be deemed to have in mind formal notices that are served upon them. It is probably the fact that the New York Central had sent many car floats to the Long Island Railroad terminal in the interval between the service of the notice and the date of the accident. But in any event, if any inference might be drawn from proof that it did not, an absence of dealing or other presumptive abandonment of the terms specified in the notice should have been shown by the libelant. As the matter stands, we have a notice giving the terms upon which the Long Island Railroad would receive floating equipment at its terminal and when the New York Central sent its car float there it must be regarded as having accepted the offer to receive it upon the terms indicated. Ten Eyck

v. Director General (C. C. A.) 267 F. 974; The Cutchogue (C. C. A.) 10 F.(2d) 671; Sun Oil Co. v. Dalzell Towing Co. (C. C. A.) 55 F.(2d) 63.

The situation is quite different from that in McWilliams Bros. v. Davis (C. C. A.) 285 F. 312, where a notice had been served by the Director General as operator of the Pennsylvania Railroad, stating that all towing of barges would be done at the risk of the tow, and that neither the tugs nor the Director General would be responsible for any damage done through negligence of the masters and crews of the tugs while engaged in the towage service. McWilliams Bros., who owned the barges in that case, served a notice declining to accept any limitation of ordinary liability for towage. We held that, where the Director General undertook to perform a towage service for McWilliams Bros. after receipt of the notice from it declining to accede to limitation of liability, the contract was made without reference to the limitation clause. In the present case, however, there was no objection to the terms of the notice, and the New York Central was accordingly in the position of one accepting an offer to receive its equipment without liability for negligence.

■ The question in the present case is whether the carrier was free to make such conditions as to liability as it thought best. If it was, there was a good contract, and the Long Island Railroad Company is not liable. Baltimore & Ohio, etc., Railway v. Voigt, 176 U. S. 498, 20 S. Ct. 385, 44 L. Ed. 560; Owen McCaffrey's Sons v. Director General (D. C.) 282 F. 728; McCormick v. Shippy (C. C. A.) 124 F. 48; Long v. Lehigh Valley R. R. Co. (C. C. A.) 130 F. 870; Graves v. Davis, 235 N. Y. 315, 139 N. E. 280; Foreign T. & M. Co. v. Moran T. & T. Co., 57 F.(2d) 143, decided by us April 4, 1932.

Ten Eyck v. Director General (C. C. A.) 267 F. 974, and The Cutchogue (C. C. A.) 10 F.(2d) 671, were towage cases where the carrier, sought to be held liable irrespective of its attempt to limit liability for its own negligence, was regarded as within its rights because the barge was not obliged to obtain the service. The distinction drawn by the trial court relied on the fact that the New York Central was obliged to go to the terminal and the Long Island Railroad Company was obliged to receive the New York Central float and to furnish it terminal facilities. The claimant, therefore, was thought to be in a position similar to that of a common carrier dealing with a passenger or shipper of freight. But the rule limiting the right of a common carrier to contract against its own negligence in dealing with passengers and shippers does not necessarily apply to dealings between connecting carriers, who are in many aspects treated as equals, neither of which is entitled to any special privileges or protection in the making of contracts. Central R. Co. of New Jersey v. Anchor Line (C. C. A.) 219 F. 716.

Under Interstate Commerce Act, § 3, par. 3, 49 USCA § 3(3), carriers engaged in the transportation of passengers or property must afford reasonable facilities for the interchange of traffic between their respective lines. Under section 3, par. 4, 49 USCA § 3(4), "if the commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a carrier owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power to require the use of any such terminal facilities, * * * on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings."

■ Under section 3, par. 4, of the Interstate Commerce Act, connecting carriers are at liberty to agree upon "terms" for the use of terminal facilities. By reason of the notice received by the New York Central without comment, we must hold that it acquiesced in the "terms" indicated in the notice, and that, when it sent its car float to the terminal, it contracted that the Long Island Railroad should be free from liability for damages suffered through the latter's negligence.

The meaning of the word "compensation" in paragraph 4 might be restricted to charges to be paid for furnishing "terminal facilities." But the word "terms" is broad, and naturally includes everything which may be regarded as a consideration for affording these facilities, including in the present case a relinquishment of claims against the Long Island Railroad for damages occasioned by the not unlikely negligent operations of its tugs about the entrance to the terminal. We think that subdivision 4 clearly shows that the carriers were free to contract as to the terms on which "terminal facilities" were furnished, and that the New York Central was under no

obligation to accept the terms offered if it was dissatisfied with them. It contracted without an appeal to the Commission. The act plainly contemplates that it may do this. Having done so, it is in a similar position to that of the owners of the floating equipment in Ten Eyck v. Director General (C. C. A.) 267 F. 974, and The Cutchogue (C. C. A.) 10 F.(2d) 671, where the railroads had given notice that they would not be liable for injuries arising from negligent towage or shifting.

It cannot be said that the Long Island Railroad furnished no consideration for affording terminal facilities, because it was obliged to furnish them in any event. It was not obliged to furnish them upon *any* terms, for, if the Central had refused to accede to its proposal, it could have appealed to the Commission. When it agreed upon terms, it gave up that right. We find nothing in the record indicating that the "terms" were not freely agreed upon by the two carriers, though they would have been open to revision if libelant had declined to accede to the arrangement. In such circumstances no rule of public policy is involved. The common law does not inhibit the contract, and the Interstate Commerce Act recognizes the right to make it. If Congress had intended further limitations upon the power to contract, it would doubtless have imposed them. Accordingly, the parties are in a position where, as was said in Gooch v. Oregon Short Line R. R. Co., 258 U. S. 22, 42 S. Ct. 192, 193, 66 L. Ed. 443, Congress must have been "satisfied to leave them to the Interstate Commerce Commission and the common law."

The New York Central has proved no cause of action against the tug Talisman. The decree is accordingly reversed, with costs, and the cause remanded, with directions to dismiss the libel.