## THE ELIZABETH M. MILLER.

## THE LOTTA COWLES.

## THE TOURIST.

### No. 1802.

District Court, W. D. New York.
July 6, 1932.

Purdy & Purdy, of New York City, for libelant.

Harry J. Kelly, of Buffalo, N. Y., for Cowles Towing Line, Inc.

Otto & Lyon, of New York City, for the Tourist.

KNIGHT, District Judge.

The steamtug Lotta Cowles, having in tow two light barges, drawn side by side, was proceeding to dock at the Lake & Rail elevator dock in the Buffalo River, at Buffalo, N. Y. The tow, driven by the wind blowing up stream, swung out of its course, and the barge Elizabeth M. Miller, which was on the port side, collided with the barge Pease, which was headed down stream and in tow of the tug Tourist. The damages claimed resulted from such collision. The evidence sustains the conclusion that they were caused by the negligent handling of the barges by the tug Lotta Cowles, and without fault on the part of the Tourist. The width of the channel was approximately 250 feet. The Cowles and tow had just passed the tug Scouten and two barges lying side by side at the dock. It is undisputed that the velocity of the wind was 30 miles an hour, and at the time of the collision the barges Miller and Liberty were headed directly across the river. In its normal course it would have proceeded on an angle toward the dock and escaped contact with the approaching barge. The distance of the Cowles' stern from the dock, the length of both the hawser and barge Miller show that the Cowles fleet obstructed the channel a distance approximately 200 feet. The width of the Tourist and tow together was 38 feet.

It is true, as asserted by libelant, that it was the duty of the tug Tourist to use every reasonable effort to prevent a collision. It seems to me it did. The Maggie J. Smith,

123 U. S. 349, 8 S. Ct. 159, 31 L. Ed. 175; Barrett v. Compagnie, 42 F.(2d) 422 (2d C. C. A.); Transfer No. 6, 45 F.(2d) 571 (2d C. C. A.).

It is claimed that the Tourist approached without slacking speed or changing its course, and also that, by altering its course, it could have passed the Miller's stern. The Tourist first saw the Cowles fleet when the latter was 400 to 500 feet ahead. The Tourist had just rounded a turn near the Lake & Rail dock. The Miller proceeded in line past the Scouten, and when about 100 to 150 feet from the Tourist swung out of its course and toward the Tourist and its barge. On approaching to pass the on-coming barges, the Tourist signalled and turned to the starboard to pass. The Tourist had no reason to anticipate that the Miller would be blown by the wind out of the course in which its tug was leading. The preponderance of the proof shows that, immediately the Tourist saw the impending danger, its engines were reversed, and it began backing up. Several witnesses testified that the barge Pease in tow of the Tourist was about ten feet from the starboard bank of the river. This barge was loaded and was lashed on the starboard side of the tug. Its bow extended about twenty feet beyond the tug. It is possible, but somewhat doubtful, that there was room to pass on the stern of the Miller. However that may be, it is clear that the Tourist, in the stress of the emergency, was operated in a manner in which any reasonably careful and capable tug captain might have operated it, even though that may not have been the best way. It is apparent that the danger threatened so quickly that there was little time for considering different methods of movement. With the barge swinging down towards the tug, the captain made quick effort to avoid collision by reversing her engines.

The original libel and complaint herein were brought only against the Lotta Cowles. These charged that the collision was due to the negligence of the Lotta Cowles. Libelant's amended pleadings allege negligence on the part of the Lotta Cowles and the Tourist.

■■ The tug Cowles was in control of the movement of the tow. The Quickstep, 76 U. S. (9 Wall.) 665, 19 L. Ed. 767; Eastern Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The J. L. Miner (C. C. A.) 260 F. 901; The Margaret Irving (C. C. A.) 47 F.(2d) 230. It was negligent in several respects in that control. The channel was narrow. The velocity of the wind was apparent. The barges were light. Passing out into the channel, it was required to pass a tug and two barges all abreast. It thus was necessary to haul the port barge well into, if not beyond, the center of the channel. It appears that such barge was a considerable distance over the center when the collision occurred. Proper handling under the existing conditions required that the barges be hauled separately instead of being lashed side by side. This could have been done with little inconvenience, and with assurance of safety. Inadequate effort was made to get the barges in line when the Tourist and tow were first sighted. The authorities under comparable facts are numerous to support the finding that the tug Cowles was negligently operated. This quotation from the opinion of Judge Manton in The R. J. Moran (C. C. A.) 299 F. 500, at page 502, in a case quite parallel in its essential features, is pertinent: "While the swinging of the tow was caused by the tide and wind, or perhaps by the tug's change of helm, her tow did swing to starboard and against the Isanti's bow, and for this she must be held responsible. The obligation to keep her tow straight behind her has been constantly enforced."

■■ Finding, as I do, that the collision resulted from the negligent management of the tug Lotta Cowles, the question arises regarding the liability of the tug Lotta Cowles to libelant for the damages sustained. The Lotta Cowles was owned by the Cowles Towing Company, Inc. It was under demise charter to the Buffalo Barge Towing Corporation. The latter paid a fixed rental for barge and operators. The Buffalo Barge Towing Corporation had an agreement by the terms of which the libelant was to place its vessels at the disposal of the Buffalo Barge Towing Corporation upon certain conditions, and in and by which it was provided that "all damages, loss, or expense to the barges named herein, howsoever caused, occurring during the currency of this agreement shall be assumed by the party of the second part" (Theodore Miller). If the effect of this agreement is to release the Buffalo Barge Towing Corporation from all damages arising out of negligence, it likewise releases the Lotta Cowles from damages herein. Libelant seeks to show that an action in rem may be maintained, even though a release has been given to the owner. He contends that in certain instances the ship is treated as the offender without reference to the liability of the owner. I do not think the cases cited are in point here. In The Oceanica (C. C. A.) 170 F. 893, it was held that, where it is shown that the claimant is exempted from legal liability, his vessel is also so exempted

(citing The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419, and The St. Hubert (C. C. A.) 107 F. 727), and that seems to be the law which should be applied in this case. The Buffalo Towing Corporation was in complete control of the operation of the Lotta Cowles, and that tug was one of the mediums through which the towing company was carrying out the aforesaid agreement. If the agreement does not cover negligence, then the vessel is liable for the damage done by the collision, even though it was being navigated by the charterer under a demise charter, as here. Rev. St. § 4286 (46 USCA § 186); The R. Lenahan, Jr. (C. C. A.) 48 F.(2d) 110; The Florence H. (D. C.) 248 F. 1012; The Barnstable, 181 U. S. 464, 21 S. Ct. 684, 45 L. Ed. 954. However, no liability in personam attaches to the owner.

The question whether the agreement such as the one at bar releases liability for negligence has been considered by the federal courts many times, and it is hardly possible to reconcile the decisions. It has been consistently held, at least in this district, that a towing company may limit its liability for negligence. In The Car Float No. 37, 57 F. (2d) 144 (C. C. A. 2d), risk of negligence was specifically made a part of the contract, and it was held that this operated as a release from liability for negligent acts. The case at bar presents a different situation, in that the provision is more general, covering "all risks of damage, loss or expense to the barges named herein, howsoever caused."

In 1870 the Supreme Court, in deciding The Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, wherein a barge owner sued for damages resulting from negligent towing, said, in passing on an agreement that the barge was to be towed at the risk of her master and owners: "Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management, the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences." The rule was reiterated in 1928 by the quotation of its very language in the case of Compania de Navegacion v. Fireman's Fund Insurance Company (The Wash Gray), 277 U. S. 66, 48 S. Ct. 459, 460, 72 L. Ed. 787. There the contract provided that "Freeport Sulphur No. 1 will furnish hawser. All other risk and expense to be borne by the tug. It is understood you will keep sufficient men on board to keep up steam and man the tug's pumps. S. S. Freeport No. 1 is not responsible in any way for loss or damage to the Wash Gray." This provision was held not to release the tug from loss or damage to the tow due to the negligence of the towing vessel.

The decision in The Syracuse had been followed, prior to The Wash Gray Case, in some of the lower courts. In this circuit, however, in The Oceanica (C. C. A.) 170 F. 893, it was apparently held that, where the tow agreed to assume "all risks," the risk of negligence was included. The reasoning was that, since a tug is not a common carrier, it is liable only for negligence, and, if the tow assumes all risks, no risks could be meant except those arising from negligence. Certiorari was denied by the Supreme Court.

There are other types of cases in which similarly worded agreements were held to include negligence as one of the risk exemptions. In Santa Fé, Prescott & Phœnix Railway v. Grant Brothers Construction Co., 228 U. S. 177, 33 S. Ct. 474, 476, 57 L. Ed. 787, the contract provided that the construction company, in return for reduced rates, should assume "all risk of loss or damage," and that the railroad should assume "no obligation or risk in case of accident or damage."

Numerous pilotage cases have been decided prior to and since The Wash Gray Case, and all have upheld the right to limit liability for negligence of the tower, and this even though negligence was not expressly mentioned as one of the excepted risks. The Margaret A. Moran (C. C. A.) 57 F.(2d) 143, Sun Oil Co. v. Dalzell Towing Co., Inc. (C. C. A.) 55 F.(2d) 63. However, in the latter case, Judge Swan points a distinction between cases of pilotage and cases of ordinary towing, and thus takes such decisions without the scope of The Wash Gray Case.

There is another line of cases typified by U. S. v. Norfolk-Berkley Bridge Corp. (D. C. E. D. Va.) 29 F.(2d) 115, 118, and The Vim, D. C. R. I. (D. C.) 40 F.(2d) 638, 640. In the former case the towing company addressed the Shipping Board, giving notice that thereafter it would take ships through a certain bridge only at their own risk. Thereafter a ship belonging to the Shipping Board was injured and considerable damage done to the bridge as the result of a collision due to the negligence of the towing company. The court said: "The correspondence * * * indicates that the towing corporation was seeking to give notice of the dangerous condition of the bridge, so as to free itself from liability for any accident arising therefrom,

rather than from the negligent operation of its own vessels." In The Vim, the tug owner advised the owner of the barge that the point of destination was not a fit place to put a boat, and that he would not undertake to dock it on his own responsibility. Having been told to go ahead, he tried to dock the barge at low tide and got somewhat off the channel, and the barge grounded. The maneuver could have been easily and safely made at high tide. The court then said: "Such an understanding as that claimed by Hayes cannot exonerate him from the responsibility of a mishap resulting, not primarily from the conditions over which he had no control, but from the faulty carrying out of the undertaking assumed." In these cases the exemptions from liability were held to have been intended to extend only to particular dangers and not to cover negligence.

The apparent meaning of the holding of The Oceanica, supra, is that, where a tow agrees to assume "all risks" without expressly mentioning negligence, it also assumes the risk of negligence on the part of the tow. Doubt is thrown on this proposition by the case of Ten Eyck v. Director Gen'l of Railroads (C. C. A.) 267 F. 974, 976, which indicates that it only goes so far as to hold that it is valid for the tower to contract against liability for negligence, and that a contract expressly providing that the tow shall be liable for negligence is valid. In the Ten Eyck Case, the contract so provided, and, answering the argument that public policy forbids the enforcement of such a provision the court said: "This court had this question presented in The Oceanica, 170 F. 893, 96 C. C. A. 69. There we approved a contract for towage of a barge which provided that—'The tow assumed no risks, and releases the tug from liability for her own negligence resulting in damage to the tow.'" Further support for this interpretation of the case is found by examination of the facts in some of the cases cited by the court in The Oceanica as illustrative of the fact that such contracts in other relations than that of tug and tow have been held to cover negligence.

In The Fri (C. C. A.) 154 F. 333, 335, the contract contained a stipulation exempting the vessel and her owner from liability for errors of navigation "occasioned by negligence, default or error of judgment of the pilot, master or mariner." Long v. Lehigh Valley R. Co. (C. C. A.) 130 F. 870, was a case in which a railway express messenger brought action against the railway with whom his employer had an agreement providing that the railway should not be or become liable or responsible to any person for damage or injury happening to any employee of the express company while acting for the express company in or about its business, whether such injury should have been occasioned by or through the negligence of the railroad company or otherwise. These cases obviously do not hold that the tow, by assuming all risks, assumes the risk of negligence, although it is not expressly mentioned. Had not the contract in The Oceanica Case been as it was stated to be in Ten Eyck v. Director-General, they would never have been cited as they were. If this be the proper interpretation of the case, then it is not out of line with The Syracuse and Compania de Navegacion v. Fireman's Fund Insurance Company, or the decisions of the other circuits.

The libel has been discontinued by consent as to the Buffalo Barge Towing Corporation and as to the Cowles Towing Company, Inc., in personam.

Under my interpretation of the cases in the Supreme Court, I am constrained to hold the barge Lotta Cowles solely liable for the damages sustained by reason of the aforesaid collision between barge Elizabeth Miller and the barge Pease. Findings may be prepared accordingly.