**HEIFETZ METAL CRAFTS, INC., a corporation, and Federal Insurance Co., a corporation, Appellants,**

v.

**PETER KIEWIT SONS' CO., a corporation, Appellee.**

No. 15939.

United States Court of Appeals
Eighth Circuit.

March 5, 1959.

Rehearing Denied April 6, 1959.

Fremont Meyers, Omaha, Neb. (Harry J. Farnham, Omaha, Neb., on the brief), for appellants.

Hird Stryker, Omaha, Neb. (Robert R. Veach, Omaha, Neb., on the brief), for appellee.

Before SANBORN, JOHNSEN and VAN OOSTERHOUT, Circuit Judges.

JOHNSEN, Circuit Judge.

Heifetz Metal Crafts, Inc., sued to have rescinded and cancelled, for alleged mistake, a subcontract on a Veterans Hospital construction-project at Topeka, Kansas, entered into by it with Peter Kiewit Sons' Co., the general contractor. Kiewit counterclaimed (joining as a party the surety on Heifetz's performance bond) for damages in breach from Heifetz's refusal to carry out the subcontract. The court, on a non-jury trial, denied relief to Heifetz and gave judgment in favor of Kiewit on its counterclaim. Heifetz and the surety have appealed.

Kiewit had been awarded the general contract to construct the Topeka hospital plant, in accordance with published plans and specifications, for a price of $17,-942,200—which was $9,000 lower than any other bid. The original bid filed by Kiewit had been $52,000 higher than its awarded price. Telegraphic reduction of the $52,000 amount was made by it on the date that the bids were to be opened. The reduction was prompted by the receipt of a long-distance telephone call that day from Heifetz, with which Kiewit had never had any previous dealings or contact, offering to do the kitchen-equipment part of the job for $99,500— a figure $52,000 less than any estimate or offer which Kiewit had had from other contractors in that field.

Kiewit inquired of Heifetz if the quotation was being made in accordance with the plans and specifications and was told that it was and that the figure would remain firm. In the course of the conversation, Heifetz further stated that it was communicating with all the other general contractors bidding on the project and was making the same quotation to each of them. In view of these facts, Kiewit decided that it ought to reduce its bid accordingly. Had the telegraphic reduction not been made, Kiewit would not have been the low bidder on the project.

After the project bidding was closed, Kiewit requested from Heifetz and was given written confirmation of the kitchen-equipment quotation. It did not, however, take any steps to tie Heifetz up on an agreement. Heifetz on the other hand kept endeavoring to find out from Kiewit whether it was going to be given the kitchen work. The parties finally, some weeks later, entered into a formal contract for the amount of Heifetz's quotation. Shortly thereafter, Kiewit asked Heifetz to provide it with rough-in drawings for the kitchen work. Heifetz replied that this would require several weeks time and that a complete copy of all the plans and specifications would be needed by it. These were sent by Kiewit, and it then telephoned Heifetz urging that the drawings for Building 20 of the project be gotten out immediately and suggesting that those for the other buildings could be forwarded later.

Heifetz thereupon woke up to the fact, for the first time, that apparently more than one building was involved in the subcontract job. In arriving at its estimate, Heifetz had used the plans for only one building, which constituted the location of the principal kitchen-equipment installation, and which it had assumed represented the only place where such work was to be done. The plans and specifications, however, called for kitchen-equipment installations of lesser degrees in several other buildings in the project.

Kiewit had had no part in or responsibility for this error of Heifetz. The mis-

taken assumption in which Heifetz had engaged came about from the fact that it had obtained and used the plans on Building 20 only, in preparing its price-figure. These plans it had borrowed from another general contracting firm, which was bidding on the project and which had asked Heifetz to give it a quotation on the kitchen-equipment work.

Heifetz's president had gone to the office of this general contractor to pick up the applicable plans and specifications. Section 502 of the specifications was given to him, which had application to the kitchen-equipment work generally, and which showed that such work covered installations in a number of buildings of the project. Neither Heifetz's president who approved the quotation (which, as indicated, was not only given to this general contractor, but also volunteered to Kiewit and the other bidders on the project), nor any of the other persons in Heifetz's organization who prepared and had responsibility for the estimate, engaged in any checking of section 502 of the specifications on this aspect.

As to the plans from which the estimate was made, Heifetz's president testified on the trial that he asked one of the general contractor's office-employees for the plans on the kitchen-equipment work, and that the employee dug out for him the two sheets of blue prints relating to Building 20 and said "This looks like it". In a previous deposition, however, he had stated that the plans for the project consisted of a voluminous pile of several hundred blueprint sheets, and that he and the contractor's employee determined that the two sheets and section 502 of the specifications represented what he needed—"that this was about what it was".

█ On this equivocalness, and with an opportunity for appraisal from hearing the witness testify, the trial court concluded and made finding to the effect that the president had had a voice and judgment as to the mode and degree of the search, selection and determination engaged in, and that the judgment reached, without examination of the index or any of the other plan-sheets of the voluminous pile, that the two sheets covered the kitchen-work involved was entitled to be regarded as being responsibly his own.

The court also concluded, apart from this responsibility for the error as to plans, that if Heifetz's employees in preparing the estimate, or the president in checking it, had not neglected to go over section 502 of the specifications, which was in their hands, the mistaken assumption engaged in as to the scope of the work would immediately have been detected; and that such an ignoring of the specifications in making a contractor's estimate, which it intended to hold out as being in accordance with both the specifications and the plans, made Heifetz's conduct amount, in the possible consequences to itself, to a failure on its part to have exercised due diligence in the situation.

The court also concluded, from the facts and circumstances of the situation and the testimony of Kiewit's employees who had handled the matter, that Kiewit neither had had knowledge nor was chargeable with knowledge of the mistake involved in Heifetz's price-quotation. Heifetz sought to have the court charge Kiewit with knowledge on the ground that its quotation was one-third less than the amount of the next subcontractor's figure, and that Kiewit therefore should have realized that there must be something wrong with Heifetz's bid.

Kiewit admitted that, when Heifetz telephoned and volunteered the quotation, it naturally was impressed by the substantiality of the price-difference and that this was one of the reasons for its taking the precaution of inquiring of Heifetz's president whether the quotation was being given on the basis of or in accordance with the plans and specifications. The employees of Kiewit who were handling the matter all testified, however, that they did not, and contractor-wise were without any reason to, regard Heifetz's figure as resting on a plans-and-specifications mistake. Kiewit had no familiarity with and had never engaged in making estimates itself in the

kitchen-equipment field. Heifetz's president had given the assurance to them that its quotation was being made in accordance with the plans and specifications and had further stated that the quotation was being communicated to all the other general contractors for bidding-use by them.

There also was testimony indicating that at times some contractor would have a special reason for desiring to obtain a particular job and would submit a figure controlled by that consideration. And as to the Topeka project itself, there had been other fields of the job in which there was as much of a variation in subcontractor's estimates as existed with respect to Heifetz's quotation on the kitchen-equipment work. Thus, the figures submitted by subcontractors on the electrical work for the project had varied from $1,400,000 to $1,850,000, and on the lathing and plastering work from $672,000 to $1,028,000; and "the mechanical spread" had been between $3,647,000 and $6,000,000.

Finally, the court held that the good-faith reliance in which Kiewit had engaged as to Heifetz's quotation had proximately resulted in Kiewit so changing its bidding position that a release of Heifetz from its contract obligation would mean a $50,100 financial prejudice to Kiewit—the difference which it was obliged to pay another subcontractor to do the kitchen-equipment work, after Heifetz's refusal to perform. With no bad faith or other inequitable conduct having been involved on Kiewit's part, the court declared that there was no equitable basis for Heifetz to ask to have the $50,100 financial prejudice occasioned by its mistake and fault shifted from itself to Kiewit.

Heifetz has challenged all of these conclusions and findings of the trial court, but within the scope and principles of federal appellate review there does not exist ground, on the record before us, for us to declare any of the resolutions made clearly erroneous. On the testimony, circumstances and implications of the situation, they are determinations which could warrantedly and justly be made by a trier of the facts. Indeed, within natural reaction, it does not impress as likely that even a jury would have resolved the facts differently.

Kiewit's reduction of its bid and its lack of attempt to tie Heifetz up on a contract would normally tend to persuade, we think that Kiewit was not acting in bad faith or with any assumption that Heifetz's bid involved a mistake and was thus likely to be a source of performance-complication on the project. But however that might be, there was, as we have indicated, such substantiality underlying all of the court's determinations, as not to leave room to overturn any of them on compelling appellate conviction and responsibility. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. Moreover, there exists as to most of them the further insulation that they involve credibility evaluation and appraisal of other intangibles, such as good faith, which necessarily have their principal illumination in trial court atmosphere.

With the determinations made by the trial court being thus entitled to stand, there is not much difficulty about the legal principles which control the result. While Heifetz's brief takes the position that Nebraska law is to be applied, because the contract was made there, and Kiewit says that Kansas law governs, because that was where the contract was to be performed, the statements of the rules engaged in as to each state are the same.

Both states, as recognized by the trial court, apply the general rule, set out in 9 Am.Jur., Cancelation of Instruments, § 33, as follows: "Generally, it may be said that equitable relief by way of rescission will be given from a unilateral mistake relating to a material feature of the contract of such grave consequence that enforcement of the contract would be unconscionable, if the party making the mistake was in the exercise of ordinary diligence, and relief can be given without serious prejudice as to the other party,

aside from the loss of his bargain". See also Annotation, 59 A.L.R. 809 et seq.

■ In converse aspect, the conscience of equity cannot ordinarily be invoked to obtain relief for unilateral mistake occasioned by the plaintiff's own failure to have exercised ordinary diligence in relation to some contractual feature. "Mistake, to be available in equity, must not have arisen from negligence, where the means of knowledge were easily accessible. The party complaining must have exercised the degree of diligence 'which may be fairly expected from a reasonable person'." Grymes v. Sanders, 93 U.S. 55, 61, 23 L.Ed. 798.

Some other element of equitable consideration than the consequence of such a mistake must be present to entitle a party to a rescission; for "the cases are practically unanimous in holding that mistake which results from failure to exercise that degree of care and diligence which would be exercised by persons of reasonable prudence under the same circumstances will not be relieved against". 9 Am.Jur., Cancelation of Instruments, § 34.

■ But beyond the matter of Heifetz's initial responsibility for the mistake in its estimate, the court was entitled—and, indeed, on its finding of good faith, lack of knowledge and reliance on Kiewit's part was required—to deny Heifetz relief, because of the occasioned prejudice which would result to Kiewit, aside from the fact itself of the loss of its bargain. Kiewit had been obliged to pay $50,100 out of its own pocket (for which the court gave it judgment on its counterclaim) to get the kitchen work done on the project, after Heifetz refused to perform its subcontract, and had thus suffered a special and affirmative prejudice.

As between them, even if Heifetz had been equally faultless with Kiewit in the occurrence of the mistake, it was nevertheless Heifetz's acts which were responsible for the injury which would be occasioned in the situation. Had Heifetz not volunteered its estimate to Kiewit

and advised that the quotation was being communicated to all other contractors, so as to put the figure in the position of becoming a general bidding factor, Kiewit would not have made its $52,000 bid-reduction.

"Where one of two parties, both guiltless of intentional wrong, must suffer a loss, the one whose conduct, act, or omission occasions the loss must stand the consequences". Kinsley Bank v. Aderhold, 131 Kan. 448, 292 P. 798, 801, 76 A.L.R. 1495. Implicit in this, of course, is a duty or responsibility in the situation. In a bidding situation, that duty or responsibility springs in the first instance from the right generally to assume that a bid submitted as to a particular thing is in conformity with the plans and specifications therefor unless otherwise indicated. Here there was in addition to this an express statement or representation. And while these things might perhaps have been without legal consequence, if no contract had subsequently been executed between the parties, they underlay, induced and had reality in the consummating instrument, into whose expression they were carried.

■ Even if the acts of Heifetz, however, had not thus directly occasioned the prejudice, the loss in the situation, which legally would be required to fall on Heifetz under the facts found by the trial court, could not at all be relieved against in equity, unless the equities of the parties' relationship and position were preponderatingly greater in favor of Heifetz than Kiewit. Otherwise the fundamental maxim would be controlling that "Between equal equities the law will prevail". Cf. Taggart v. Keim, 3 Cir., 103 F.2d 194, 199. A court of equity will not intervene, "where there are equal equities or where there are no equities". Pacific Royalty Co. v. Williams, 10 Cir., 227 F.2d 49, 58.

■ Finally, another basic principle and policy also enters into the present situation. Where both parties are innocent of intentional wrong, rescission is primarily a remedy for preserving or restoring the previous position of each

of them. "A court of equity is always reluctant to rescind, unless the parties can be put back in statu quo. If this cannot be done, it will give such relief only where the strongest equity imperatively demands it". Grymes v. Sanders, 93 U.S. 55, 62, 23 L.Ed. 798.

Among the filaments of its attempted equitable weave, as between the result to itself and to Kiewit, Heifetz's brief makes the argument that "it is within the realms of both judicial notice and common knowledge" that Kiewit's profit on the $18,000,000 job would leave the $50,100 extra cost to it as "relatively insignificant". There is nothing in the record to indicate whether Kiewit had a profit or a loss from the project, nor would it be possible for this fact to constitute an equity between the parties. When Kiewit reduced its bid on the basis of Heifetz's quotation, any possibility of an unjust enrichment from Heifetz's mistake was necessarily eliminated. Without bad faith or other chargeable fault, and without enrichment as against Heifetz, Kiewit could not be made to bear the burden of Heifetz's mistake.

Affirmed.