UNITED STATES of America,
Plaintiff-Appellant,

v.

BISSETT–BERMAN CORPORATION, Pike Corporation of America, Western Offshore Drilling and Exploration Company and M/V NESCO I, Defendants-Appellees.

No. 71–1658.

United States Court of Appeals, Ninth Circuit.

June 7, 1973.

John F. Meadows (argued), Admiralty and Shipping Section, Dept. of Justice, San Francisco, Cal., Robert L. Meyer, U. S. Atty., Clarke A. Knicely, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellant.

Gerald N. Gordon (argued), of Paul & Gordon, Lawrence D. Bradley, Jr. (argued), B. H. Dorman, Jr., of Lillick, McHose, Who Adams & Charles, Los Angeles, Cal., for defendants-appellees.

Before DUNIWAY and TRASK, Circuit Judges, and TALBOT SMITH,* District Judge.

TRASK, Circuit Judge:

Summary judgments were entered against the United States and in favor of the defendant, Bissett-Berman Corporation, and others in actions filed by the United States as plaintiff, under 28 U. S.C. § 1345, to recover damages for breach of contract to make certain marine installations. The United States appeals from those summary judgments for the defendants. We affirm.

On June 11, 1964, the Navy Electronics Laboratory (NEL) invited a proposal for the design, fabrication, installation at sea, and operational testing *in situ* of what was described as a "Deep-Moored Vertical Hydrophone Array with Radio Telemetry Line." The invitation contemplated a proposal to award two contracts to the same contractor. First, a research and development contract covering the design, fabrication and interim testing of the array; and second, a time and material contract covering the installation and checkout at installation sites.

Bissett-Berman Corporation (BBC) was awarded both contracts. The manufacturing contract was completed and after dockside checkout was approved, BBC proceeded with the installation of the system at sea at a point approximately 18 miles off Point Arena, California. For this purpose BBC chartered a ship, the M/V Nesco I from Western

---

* The Honorable Talbot Smith, United States District Judge, for the Eastern District of Michigan, sitting by designation.

Offshore Drilling & Exploration Company (WODECO), a division of Pike Corporation of America. The system was installed on or about April 27, 1967. In place it consisted of surface marker buoys to which was attached a polypropylene line leading to a subsurface buoy some 1,000 feet below the surface. From that point an armored cable descended 5,000 feet more to the bottom. Although anchored at the bottom, the cable thereafter extended 7,000 feet along the bottom to a point at which it was again anchored. It then was brought to the surface where it attached to the transmission buoy. The hydrophone array was attached to the descending cable. Thus, on the surface the marker buoys and the transmission buoy were 7,000 feet apart although connected by a continuous line and cable beneath the surface.

Approximately 30 days after initial installation the transmission buoy broke loose and the cable to which it was attached dropped to the floor of the ocean. This buoy was recovered, repaired, and BBC was instructed by the United States to reinstall the system. The plan was to recover the system by locating the two marker buoys, which established the other end of the system, and by pulling these on the ship and thereafter the cable to which they were attached. This procedure would result in the recovery of the hydrophone array and the rest of the cable to which the transmission buoy had been attached at the opposite end of the installation. The transmission buoy would then be reattached to its end of the system and the apparatus replaced in the sea.

The marker buoys on the surface were located and pulled aboard. Because it was difficult to haul in the line, Mr. Wyborny, the BBC employee in charge of the operation, instructed the captain by hand signal to back the ship so as to create slack in the line. Too much slack was created quickly however permitting the polypropylene line to become entangled in the propellers. During an attempt to splice the line around the tangle, it parted and all was lost beneath the surface.

As a result of the loss of the hydrophone array, the United States filed this action asserting several claims against BBC. The first was for breach of the contracts claiming damages; second, for breach of warranty that the system was free from defects and conformed to specifications; third, for the amount of insurance coverage procured by BBC to protect and indemnify BBC against liability for loss or damage to government property in BBC's possession or control; fourth, for gross negligence tantamount to willful misconduct or bad faith on the part of BBC's representatives in their handling of government property.[1] The total amount sought was $742,561.50.

In addition, and in the same action below, the United States asserted several claims in separate causes of action against Pike, owner of Nesco I, and WODECO, operator of Nesco I, in personam and against Nesco I in rem. The first cause of action was for damage caused by the negligent navigation of the vessel resulting in the fouling of the polypropylene line and the loss of the array; the second was for damage caused by negligence of the crew.

Finally, the United States added a fifth and sixth cause of action against BBC sounding in contract, asserting that to the extent that BBC had failed to provide in its subcontracts with the divers, (fifth cause of action), and with

---

1. Clause 5(f)(1) of the contract provided in pertinent part that:
   "The contractor shall not be liable for any loss of or damage to the Government Property, or for expenses incidental to such loss or damage, except that
   . . .
   \*      \*      \*      \*      \*

   "(i) which results from willful misconduct or lack of good faith on the part of anyone of the Contractor's directors or officers, or on the part of any of his managers, superintendents, or other equivalent representatives . . . . ." C.T. at 70.

the vessel and its owners, (sixth cause of action), for liability of the subcontractors to the government and had by subcontract relieved the subcontractors of liability for loss and destruction of the array, BBC was liable to the United States. In support of this theory, the United States relied upon a paragraph of the Pike and WODECO subcontract which provided that BBC personnel aboard the ship would be in complete charge of the installation thus making the Pike and WODECO personnel on the ship "borrowed servants" of BBC and exonerating them from direct liability according to the government's theory.

Under Rule 56(c) Fed.R.Civ.P. a summary judgment shall be rendered forthwith,

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The affidavits shall be made on personal knowledge,

"shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e).

■■■ Thus, the district court does not try issues of fact. Its function is to determine whether an issue of fact exists which might be material to the determination of an issue in the case. On review it is our function to determine "whether there is any genuine issue of material fact underlying the adjudication, and, if not, whether the substantive law was correctly applied." 6 Moore's Federal Practice (2d ed.) ¶ 56.27 [1] at 2973; Vickery v. Fisher Governor Co., 417 F.2d 466 (9th Cir. 1969).

The issue upon which the district court decided the case in favor of BBC was that all of the claims asserted by the United States against BBC in the first four causes of the First Amended Complaint were barred by a Stipulation of Settlement executed between the parties on December 22, 1969.

After the loss of the array and before the action was filed in the district court, the contracting officer of the government directed BBC to pay certain sums to it as damages for the loss of the array and announced that the government was not obligated to pay the balances due under the contract. BBC appealed both decisions to the Armed Services Board of Contract Appeals (ASBCA). The pleadings in those cases raised the same legal issues as are set out in the first four causes of action of the government's complaint in this litigation.[2] During the course of preparation for the trial of those appeals and following the pretrial hearing, attorneys for the government instituted negotiations looking toward a settlement of the two cases which had been consolidated. After a number of conversations and meetings concerning the settlement an agreement was reached and a stipulation prepared, but a representative of the government[3] refused to approve it and took it to Washington for further review and consideration. Almost two months later negotiations were resumed, a Stipulation of Settlement was prepared by the government and signed by the parties. It carried the caption of the ASBCA action, identified the two cases on appeal and was filed in the case.[4]

2. This becomes evident by a comparison of the allegations of the amended complaint with the provisions of the government's counterclaim to BBC's before ASBCA. C.T. at 200.

3. Albert C. Kornblum, Esq., Assistant to the General Counsel for the Navy.

4. The Stipulation, eliminating the caption, is as follows:

"STIPULATION OF SETTLEMENT

"WHEREAS the items delivered by the contractor under contract number 50181A on or before April 21, 1967, were accepted by the Government and;

"WHEREAS title to said items passed to the Government at that time and;

"WHEREAS certain services were performed by the contractor under contract number 51848A for the purpose

On December 29, 1969, an Order of Dismissal with Prejudice was entered in the cases based upon the Stipulation of Settlement which had been filed. The order carried the caption of the two cases and showed the appearance of Murray H. Marker, Esq., Counsel, Navy Purchasing Office and Martin L. Glass, Esq., Assistant Counsel, appearing for the government, and Gerald N. Gordon, Esq., appearing for the appellant. It was signed by Joseph B. Kennedy, Jr., for the Board and bore the signed concurrences of four other members.[5]

■ The government contends that the stipulation is a nullity because there was no meeting of the minds and because the attorney who signed had no authority to do so. As to the meeting of the minds, the language of the stipulation appeared perfectly clear to the trial court and appears entirely so to us. The later discovery by the government of its unilateral mistake that a payment had been made so that the government should have reduced its settlement figure accordingly does not prevent a contract under the facts of this case.[6] Heifetz Metal Crafts, Inc. v. Peter Kiewit Sons' Co., 264 F.2d 435 (8th Cir. 1959); Bowser, Inc. v. Hamilton Glass Co., 207 F.2d 341 (7th Cir. 1953); United States v. Jones, 176 F.2d 278, 285 (9th Cir. 1949). There was no showing of mutual mistake or of fraud on the part of BBC.

■ As to the authority of Mr. Marker to sign the stipulation instead of the contracting officer, Mrs. Barger, it

---

of site survey and installation of said items of Government property and;

"WHEREAS the contractor has asserted claims against the Government for payment of amounts totaling $106,-504.32 asserted to be for payments due under said contracts and;

"WHEREAS the Government has asserted a number of counterclaims against the contractor, including defenses of non-acceptance of said items, existence of latent defects, breach of warranty, and for loss of or damage to Government property resulting from willful misconduct or lack of good faith on the part of contractor's directors or officers or other managerial or supervisory personnel;

"NOW, THEREFORE, THE PARTIES HAVE AGREED AS FOLLOWS:

"1. The Government will pay to the contractor the sum of $100,000.00 in full and complete settlement of any and all claims arising under said contracts, and the contractor shall release the Government from any and all such claims; and further it is agreed that the above described counterclaims of the Government are hereby withdrawn and shall be considered dismissed with prejudice;

"2. Nothing contained herein, however, shall be considered to be or constitute a waiver or release by the Government of any claims against the contractor, its agents, employees or subcontractors for negligence or breach of contract or any other claims the Government may have against the contractor, its agents, employees or subcontractors not hereinabove withdrawn by the Government; provided, however, that this reservation shall in no manner constitute a recognition or admission by the contractor of any negligence or breach of contract;

"3. The Board is requested to strike from the calendar and dismiss the subject appeals herein.

"DATED: 22 December 1969" C.T. at 176.

5. The order, eliminating caption and appearances, and Board signatures, is as follows:

"ORDER OF DISMISSAL

"The parties having heretofore filed a Stipulation of Settlement of these matters wherein they agreed to mutually release one another from the various claims and counterclaims for which a remedy is provided under the contract; and the parties having further agreed to dismissal of said claims with prejudice,

"Now, therefore, it is Ordered that these appeals be, and hereby are, dismissed with prejudice.

"Dated 29 December 1969." C.T. at 180.

6. At oral argument below the attorney for the United States acknowledged that the figure of $100,000 was agreed upon by mistake upon the part of the government's representatives who thought that nothing had theretofore been paid by the government. In fact $16,000 had already been paid and the intention of the representative of the government was that any such sum already paid should have been deducted.

would appear that there is more involved here than the execution of a contract. The parties were in fact settling a law suit. The stipulation was prepared un-· der the caption of the case for filing therein, and the Order of Dismissal showed that Mr. Marker and Mr. Glass both appeared for the government for the purpose of the entry of the order.[7] The court and the opposite parties were entitled to assume that the government attorneys had the authority to obtain the Order of Dismissal. It was not conditional. Mr. Marker stated in his affidavit filed in the trial court that:

> "Prior to this meeting [on December 22, 1969] I was given to understand that the Contracting Officer would be willing to accept a settlement amounting to a total of $100,000. . . . ."[8] C.T. at 419.

■ Appellant next contends that the stipulation was a nullity because the "money to effectuate the settlement could only have been obtained by contract modification" (Appellant's Opening Brief at 39), and Mr. Marker, the attorney who signed the stipulation was not a contract officer and had no authority to sign a contract modification. The trial court did not regard the stipulation as simply a contract modification, nor do we. It may have had an effect on a dispute arising out of a contract, but it was in fact and in law the settlement of claims in litigation before an administrative body constituted by law to make an adjudication.[9] As a result of the stipulation and relying upon the representation of authority of the two attorneys for the Navy to act on behalf of their clients the Board dismissed the appeal with prejudice. Although the appellant contends the attorneys who represented the government in the negotiation of the contract modification had no authority to bind their clients to a contract modification, the government has not suggested that Marker and Glass were not its attorneys before the ASBCA and authorized to appear and act for it. The trial court was correct in its ruling in favor of BBC on the first four causes of action of the Amended Complaint.

---

7. C.T. at 180.

8. Evidence of authority may also be found in the fact that (1) the contracting officer, Barger, was present during a portion of the settlement discussions on December 22, 1969, when the stipulation was signed, to explain payment procedures [C.T. at 481]; (2) the government attorneys prepared the document; (3) after the settlement was executed the government paid BBC $66,677.23 that it had been holding under both contracts for well over two years [C.T. at 509]; and (4) subsequent to the execution of the stipulation, the contracting officer prepared a contract modification [C.T. at 419] that provided:
   "The purpose of this modification is to adopt in full and to give contractual effect to the 'Stipulation of Settlement' executed on 22 December 1969 by Murray H. Marker, Counsel for the Government, and Gerald N. Gordan [sic] Counsel for Appellant. Such 'Stipulation of Settlement' is hereby attached and incorporated herein by reference." C.T. at 428.
   *See also* United States v. Jones, 176 F.2d 278 (9th Cir. 1949); Max Drill,

Inc. v. United States, 427 F.2d 1233, 1243, 192 Ct.Cl. 608 (1970); George H. Whike Construction Co. v. United States, 140 F.Supp. 560, 135 Ct.Cl. 126 (1956).

9. Armed Services Boards of Contract Appeals derive their authority from the Standard Disputes Clause found in government procurement contracts. This clause provides for an appeal to the Secretary from any decision of the Contracting Officer on matters of fact. The Secretary has in turn delegated his decisionmaking authority to the Board. 32 C.F.R. 30.1 Appendix A (1972); C.C.H. Gov't Contracts Rep. ¶ 23,055 at 11,242–43; McBride & Wachtel, 1 Government Contracts § 6.10. The present Board was reorganized May 1, 1962 into eleven divisions presided over by a Chairman and two Vice Chairmen. The contracts between BBC and U. S. Navy Purchasing Office contain the Standard Disputes Clause, which do provide for an appeal to the Secretary. C.T. at 76, 125.
   Limited judicial review of Board decisions is available under the Wunderlich Act, 41 U.S.C. § 321. *See* Northwestern Industrial Piping, Inc. v. United States, 467 F.2d 1308 (Ct.Cl.1972).

The Stipulation of Settlement reserved to the government the right to assert the fifth and sixth causes of action against BBC. These were based purely on breach of contract, alleging that BBC had failed to enforce the liability of the divers (fifth cause of action) and that BBC had omitted from the subcontracts provisions which would have protected the government against loss of or damage to its property in the possession of BBC's subcontractors (sixth cause of action). The court granted summary judgment in favor of BBC on both causes of action.

■ Looking to the fifth cause of action, the contention is that a provision should have been inserted in the contract between BBC and the divers that the latter were absolutely liable for the loss of any government property in their possession.[10] The district court, however, expressly found that BBC "never gave possession or control of the hydrophone array system to either Western Offshore Drilling and Exploration Co. Division of Pike Corporation of America or the Rogers Diving Service."[11] At the time of the loss of the system it had already been implanted in the ocean by BBC and the effort was to recover it so that the transmitting buoy could be reattached to the other end. Until recovered it was in no one's possession. The affidavits in support of the motions for summary judgment also support the court's finding that the divers never had possession and control of the array. There was no genuine issue of fact upon this point.

The sixth cause of action is based upon the same theory. The government relies upon Clause 5(f)(1) of the installation contract which provides:

"This clause shall not be construed as relieving a subcontractor from liability for loss or destruction of or damage to Government Property in his possession or control, except to the extent that the subcontract with the prior approval of the Contracting Officer, may provide for the relief of the subcontractor from such liability. In the absence of such approval, the subcontract shall contain appropriate provisions requiring the return of all Government Property in as good condition as when received, except for reasonable wear and tear or for the utilization of the property in accordance with the provisions of the prime contract." C.T. at 70.

The same finding of the trial court which forecloses the fifth cause of action stands as a bar to the government in the sixth. In addition, the Pike & WODECO contract contained the following provision:

"It is understood and agreed that BBC personnel will be in complete charge of the above installation with the exception that at any time, the ship's master will have sole discretion to act to protect the lives and safety of the crew and passengers, regardless of any instruction contrary to such action, if, in his opinion, any undue danger exists." C.T. at 254.

■ It appears to be appellant's argument that this provision in the contract between BBC and WODECO will release WODECO from liability to the government. Actually, a literal reading of the clause discloses that it does not purport to release WODECO from liability to the United States if one does exist. Clause 5(f)(1) does not require the prime contractor to make its subcontractors "absolutely liable" to the government. It requires a provision that the subcontractors return government property if they have any. Here they had none. If the subcontractors became liable in negligence to the government, the

---

10. The government does not assert that the divers were negligent. At page 7, line 15, of the Reporter's Transcript, the government attorney told the trial court: "I don't contend that the diver was actually negligent." The divers were not made parties defendant.

11. C.T. at 530.

cause of action thus created could not be contracted away without the government's consent. Unless released by the government, it would still remain. The W. C. Block, 71 F.2d 682 (2nd Cir.), cert. denied sub nom. Cornell Steamboat Co. v. Scholl, 293 U.S. 579, 55 S.Ct. 91, 79 L.Ed. 676 (1934); George Bohannon Transportation, Inc. v. Davis, 323 F.2d 755 (10th Cir. 1963).

The prime contractor, BBC, could have provided its own ship and crew and thereby would have become responsible for the negligence of its own servants and employees, if in fact such liability were established. It did not do this. It contracted with Pike, WODECO and the divers, but retained all supervision and control over their activities.[12] We find nothing in the government contract which proscribes this, either as to Pike, WODECO or the divers.

Finally, the government asserts a direct cause of action against defendants Pike, WODECO and Nesco I in rem for maritime tort in the operation and navigation of the vessel, and a second cause of action against the same defendants based upon the negligence of the crew (the divers) in handling the line of the array whereby it was lost.

As to the claim based upon a maritime tort in the operation and navigation of the vessel, the subcontract with BBC provides that BBC personnel will be in complete charge of the operation. Notwithstanding the findings which support the fact of supervision and control in BBC and not in Pike, WODECO or the vessel's crew, the government contends that this is a maritime tort. It likens the asserted maritime liability to the liability of the ship and owner for collision with another vessel even though the maneuvering of the vessel is under the control of a "compulsory pilot."

The difficulty with the "compulsory pilot" analogy is that the facts as shown by the affidavits, the contracts and the findings of the trial court, establish that the "compulsory pilot" was BBC. It was in complete control of the salvage operation and exercised that control by signals to the master to direct the backing of the ship when the line became fouled in the propeller. Yet BBC as the operator was not liable in personam because its contract with the government made it liable only for damage or loss as a result of *willful misconduct*. No such showing was made. In addition, the settlement agreement released BBC from claims for willful negligence which was the only negligence alleged (fourth cause of action). Here then the "compulsory pilot" has been released and the question is whether an in rem maritime claim on the vessel may be imposed nonetheless. We are of the opinion that it cannot and sustain the trial court's holding. Only two cases were cited by the government on the point. One of them, Homer Ramsdell Transportation Co. v. La Compagnie Générale Transatlantique, 182 U.S. 406, 21 S.Ct 831, 45 L.Ed. 1155 (1901), is not in point because it is an action at law and not in admiralty. The authority of The China, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1868), for the proposition that an in rem libel against the ship may be maintained when an action against its owner or operator can not has been weakened if not destroyed by subsequent cases. In Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L. Ed.2d 205 (1962), where the question was liability based upon unseaworthiness, the Court declined to clearly decide the issue. *See* Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963) (where the Court also declined to decide the question). In the courts of appeals it appears clear that most, if not all, have held that in personam liability is a *sine qua non* for in rem liability against the ship. Ramos v. Beauregard, Inc., 423 F.2d 916 (1st Cir.), cert. denied, 400 U.S. 865, 91 S.Ct. 101, 27 L. Ed.2d 104 (1970); Alcoa Steamship Co. v. Rodriguez, 376 F.2d 35 (1st Cir.), cert. denied, 389 U.S. 905, 88 S.Ct. 215, 19 L.Ed.2d 219 (1967); Noel v. Is-

---

12. Findings of Fact X, XI, XII. C.T. at 535.

brandtsen Co., 287 F.2d 783 (4th Cir.), cert. denied, 366 U.S. 975, 81 S.Ct. 1944, 6 L.Ed.2d 1284 (1961).

Judge Learned Hand has been cited as being on both sides of the controversy. *See* Noel v. Isbrandtsen Co., *supra* at 786 n. 6. In Burns Co. v. The Central R. R., 202 F.2d 910, 912 (2nd Cir. 1953), he refers to the idea of the ship as a tortfeasor as difficult to explain "on any other theory than a vestigial devolution out of the notion that anything that moves and kills a man shall be deodand to the king."

Even in *The China, supra,* which seems to be the only clear decision that the vessel itself can be libeled absent in personam liability, there must be a showing that the vessel is a "wrong-doer." [13]

In the present case the undisputed facts fail to indicate that the navigation was negligent or careless. We can find no rational basis to assume that because the vessel was moving it was at fault under the circumstances disclosed and decline to adopt the in rem liability theory where in personam liability does not exist.

■ Here, the officer in charge was under the direct and exclusive command of BBC and acting at the time under BBC's supervision and control. A release given to BBC would therefore include the in rem liability of the ship. The Queen of the Pacific, 180 U.S. 49, 21 S.Ct. 278, 45 L.Ed. 419 (1901); The Elizabeth M. Miller, 3 F.Supp. 171, 172–173 (W.D.N.Y.1932). The other theory of liability urged by the government to support the liability of the owner of the Nesco I is that fault is presumed against a moving vessel which collides with a properly moored ship—the doctrine of res ipsa loquitur. Granting that the doctrine is well recognized in admiralty, it poses no new concept of tort law. It is an inference of negligence which is raised because it is the type of accident that does not ordinarily occur absent someone's negligence, and the evidence to prove it is circumstantial.[14] Here, however, we have more than the inference or presumption to look upon. We have the affidavits of those at the scene which stated in detail how the accident came about. It was a difficult and delicate maneuver under adverse circumstances to attempt to secure a line and put it aboard and onto a reel where it could be hauled up from 6,000 feet. There is no room in face of the affidavits and reports, including the Allen reports submitted by the government, to rely on presumptions. Explanation abounds as to just what happened and there is no material difference among those who observed. On the basis of the undisputed facts we believe that the trial court's order was entirely proper.

■ Under the circumstances disclosed by the affidavits and expressly found by the trial court, the crew of Nesco I was "loaned to" or were the "borrowed servants" of BBC.[15] Thus BBC and not Pike and WODECO is responsible for the action of Nesco I and its crew during the salvage operations. The borrowed servant doctrine is recognized and followed by this court. Denton v. Yazoo & Mississippi Valley R. R., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310 (1932); United States v. N. A. Degerstrom, Inc., 408 F.2d 1130, 1133 (9th Cir. 1969); McCollum v. Smith, 339 F. 2d 348 (9th Cir. 1964).

We have examined the pleadings and the affidavits on file and agree with the trial court that there is no genuine issue of material fact and that the trial court has correctly applied the substantive law involved. Accordingly, the judgment is affirmed.

13. "According to the admiralty law, the collision impresses upon the *wrongdoing* vessel a maritime lien." *The China, supra,* 7 U.S. at 68 (emphasis added).

14. American Law Institute, Restatement of Torts, Second, § 328D.

15. C.T. at 535.